UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EVAN WEINER and TIMOTHY McCLAUSLAND, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SNAPPLE BEVERAGE CORPORATION,<br><br>Defendant. | CIVIL ACTION<br><br>Civil Action No. 1:07-cv-08742 (DLC) |

**DEFENDANT SNAPPLE BEVERAGE CORPORATION'S
OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

Dated:   April 9, 2010.

Van H. Beckwith
**Baker Botts L.L.P.**
2001 Ross Avenue
Dallas, Texas  75201
(214) 953-6500
and
Seth T. Taube
Maureen P. Reid
**Baker Botts L.L.P.**
30 Rockefeller Plaza
New York, New York  10112
(212) 408-2500

**Attorneys for Defendant
Snapple Beverage Corporation**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

INDEX OF SUPPORTING EXHIBITS ............................................................................... vii

STATEMENT OF FACTS ..................................................................................................... 1

    I.       Plaintiffs' Claims ..................................................................................................... 1

    II.      Plaintiffs' Testimony .............................................................................................. 2

          A.      Plaintiff Timothy McCausland ................................................................. 2

          B.      Plaintiff Evan Weiner ............................................................................... 3

          C.      Putative Class Member Stacy Holk ......................................................... 4

    III.     Snapple Beverage Corporation ............................................................................... 5

          A.      Snapple's History and Its Marketing ........................................................ 5

          B.      Snapple's Teas and Juice Drinks .............................................................. 8

          C.      Snapple's Distribution and Pricing ......................................................... 11

ARGUMENT ......................................................................................................................... 11

    I.       Plaintiffs Bear the Burden to Prove Class Certification Requirements. .............. 11

    II.      Plaintiffs Have Failed to Prove That Common Issues Predominate. .................... 12

          A.      Individualized Issues Dominate Plaintiffs' New York Consumer
                Protection Act Claim ............................................................................... 12

               1.      Causation and Injury Present Individual Issues. ........................... 13

                    a.      Applicable law. ................................................................. 13

                    b.      Proving an alleged price premium, if any, would
                          require individual inquiries because there is no
                          uniform price class wide. ................................................. 15

                    c.      Proving causation and injury requires individual
                          inquiries into consumers' knowledge, opinions and
                          purchasing decisions. ....................................................... 20

               2.      Determining Whether Any Consumer Was Misled In A
                    Material Way Depends On Individualized Proof .......................... 24

        3.     Determining Damages, If Any, Would Require
              Individualized Assessment........................................................... 27

    B.    Individual Questions Dominate Plaintiffs' Warranty Claims. ................. 28

    C.    Individual Questions Dominate Plaintiffs' Unjust Enrichment Claim. .... 30

    D.    Defenses Present Individual Issues. ......................................................... 31

III.   Plaintiffs Have Failed to Prove That the Proposed Class Is Ascertainable. ......... 31

IV.   Plaintiffs Have Failed To Prove Typicality and Commonality. ........................... 33

V.    Plaintiffs Have Failed to Prove Superiority. ........................................................ 34

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ballas v. Virgin Media, Inc.*,
   No. 600014-2007, 2007 WL 4532509 (N.Y. Sup. Ct. Dec. 6, 2007) ....................................31

*Beth Israel Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
   448 F.3d 573 (2d Cir. 2006)..................................................................................................30

*Brissenden v. Time Warner Cable*,
   885 N.Y.S.2d 879 (N.Y. Sup. Ct. 2009) ...............................................................................14

*Broder v. MBNA Corp.*,
   722 N.Y.S.2d 369 (1st Dep't 2001) .......................................................................................26

*CBS, Inc. v. Ziff-Davis Pub. Co.*,
   553 N.E.2d 997 (N.Y. 1990)..................................................................................................28

*Congregation Yetev Lev D'Satmar Inc., v. 26 Adar N.B. Corp.*,
   596 N.Y.S.2d 435 (2d Dep't 1993).......................................................................................31

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
   502 F.3d 91 (2d Cir. 2007)....................................................................................................34

*Cortigiano v. Oceanview Manor Home For Adults*,
   227 F.R.D. 194 (E.D.N.Y.2005) ...........................................................................................31

*Cosy Goose Hellas v. Cosy Goose USA Ltd.*,
   581 F. Supp. 2d 606 (S.D.N.Y. 2008)...................................................................................29

*Couser v. Rockwell International, Inc.*,
   536 N.Y.S.2d 965 (N.Y. Sup. Ct. 1989) ...............................................................................31

*Donald v. Shinn Fu Co, of Am.*,
   2002 WL 32068351 (E.D.N.Y. Sept. 4, 2002) .....................................................................29

*Dungan v. The Academy at Ivy Ridge*,
   249 F.R.D. 413 (N.D.N.Y. 2008) ....................................................................................14, 30

*Dupler v. Costco Wholesale Corp.*,
   249 F.R.D. 29 (E.D.N.Y., 2008) ...........................................................................................26

*Elias v. Ungar's Food Products*,
   252 F.R.D. 233 (D.N.J. 2008)...............................................................................................26

*Fitzpatrick v. Gen. Mills,*
    263 F.R.D. 687 (S.D.Fla. 2010) ................................................................26, 27

*Fogarazzao v. Lehman Bros., Inc.,*
    232 F.R.D. 176 (S.D.N.Y.2005) ....................................................................31

*Fogarazzo v. Lehman Bros.,*
    263 F.R.D. 90 (S.D.N.Y. 2009) ....................................................................18

*Gaidon v. Guardian Life Insurance Co. of America,*
    96 N.Y.2d 201 (2001) ....................................................................................31

*Hubbard v. General Motors Corp.,*
    No. 95 Civ. 4362, 1996 WL 274018 (S.D.N.Y. May 22, 1996)....................30

*In re Alstom SA Sec. Litig.,*
    253 F.R.D. 266 (S.D.N.Y. 2008) ..................................................................18

*In re Canon Cameras Litig.,*
    237 F.R.D. 357 (S.D.N.Y. 2006) ............................................................15, 30

*In re Currency Conversion Fee Antitrust Litig.,*
    230 F.R.D. 303 (S.D.N.Y. 2004) ..............................................12, 13, 14, 31

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    574 F.3d 29 (2d Cir. 2009)............................................................................13

*In re Hydrogen Peroxide,*
    552 F.3d 305 (3d Cir. 2008)..........................................................................13

*In re Initial Pub. Offering Sec. Litig.,*
    471 F.3d 24 (2d Cir. 2006)................................................................11, 12, 28

*In re Linerboard Antitrust Litig.,*
    305 F.3d 145 (3d. Cir. 2002)........................................................................29

*In re Sony SXRD Rear Projection Television Class Action,*
    No. 06 CIV. 5173(RPP), 2008 WL 1956267 (S.D.N.Y. 2008) ...................29

*In re Worldcom, Inc.,*
    371 B.R. 33 (Bankr. S.D.N.Y. 2007).............................................................30

*In re Zyprexa Products Liability Litig.,*
    671 F. Supp. 2d 397 (E.D.N.Y. 2009) ..........................................................30

*J.C. Constr. Mgmt. Corp. v. Nassau-Suffolk Lumber & Supply Corp.,*
    789 N.Y.S.2d 903 (2d Dep't 2005)...............................................................28

*Jermyn v. Best Buy Stores, L.P.,*
    256 F.R.D. 418 (S.D.N.Y. 2009) ...................................................................................26

*Klein v. Robert's Am. Gourmet Food, Inc.,*
    808 N.Y.S.2d 766 (2d Dep't 2006)...............................................................................29

*Lapin v. Goldman Sachs & Co.,*
    254 F.R.D. 168 (S.D.N.Y. 2008) ..................................................................................18

*Matter of Schultz v. State of New York,*
    81 N.Y.2d 336 (N.Y. 1993) ..........................................................................................31

*McLaughlin v. Am. Tobacco Co.,*
    522 F.3d 215 (2d Cir. 2008)..................................................11, 13, 14, 16, 17, 19, 27, 28, 31

*Newman v. RCN Telecom Servs.,*
    238 F.R.D. 57 (S.D.N.Y. 2006) ...........................................................................13, 31, 33

*Oshana v. Coca-Cola Co.,*
    472 F.3d 506 (7th Cir. 2006) .......................................................................................21

*Oswego Laborers' Local 214 Pension Fund v. Marine Bank, N.A.,*
    85 N.Y.2d. 20 (N.Y. 1995) .....................................................................................15, 24

*Pruitt v. Rockefeller Ctr. Prop.,*
    574 N.Y.S.2d 672 (1st Dep't. 1991) ............................................................................26

*Sessa v. Riegle,*
    427 F.Supp. 760 (E.D. Penn. 1977) .............................................................................28

*Small v. Lorillard Tobacco, Inc.,*
    94 N.Y. 2d 43 (1999) ...................................................................................................13

*Solomon v. Bell Atlantic Corp.,*
    777 N.Y.S.2d 50 (1st Dep't 2004) ..........................................................................24, 31

*Stutman v. Chem. Bank,*
    95 N.Y.2d 24 (2000) ....................................................................................................13

*Taylor v. Am. Bankers Ins. Group,*
    700 N.Y.S.2d 458 (1st Dep't 1999) ..............................................................................26

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,*
    546 F.3d 196 (2d Cir. 2008)........................................................................................12

*Whalen v. Pfizer,*
    No. 600125105, 2005 WL 2875291 (N.Y. Sup. Ct. Sept. 22, 2005)...............................24, 30

**STATUTES AND RULIES**

N.Y. C.P.L.R. § 213(2) ................................................................................................31

N.Y. C.P.L.R. § 214(2) ................................................................................................31

Federal Rule of Civil Procedure 23 ....................................................................... passim

N.Y. U.C.C. § 2-725 (2001)........................................................................................31

New York General Business Law Section 349................................................... passim

**OTHER AUTHORITIES**

56 Fed. Reg. 60421, 60467 (Nov. 27, 1991)...............................................................24

58 Fed. Reg. 2302, 2407 (Jan. 6, 1993) ...........................................................10, 23

## INDEX OF SUPPORTING EXHIBITS

### Plaintiffs' Testimony

A.    Transcript of Deposition of Stacy Holk and Counsel's Narrative Summary

B.    Transcript of Deposition of Timothy McCausland and Counsel's Narrative Summary

C.    Transcript of Deposition of Evan Weiner and Counsel's Narrative Summary

### Snapple Witnesses' Testimony

D.    Excerpts of Deposition of Kyle Currlin

E.    Excerpts of Deposition of Kris Mains

F.    Excerpts of Deposition of Bryan Mazur

G.    Declaration of Bryan Mazur with Exhibits

### Snapple's Expert Reports

H.    Expert Report of Michael B. Mazis, Ph.D., with Exhibits

I.    Expert Report of Thomas J. Montville, Ph.D., with Exhibits

J.    Expert Report of Keith R. Ugone, Ph.D., with Exhibits

### Plaintiffs' Experts' Testimony

K.    Transcript of Deposition of Alan G. Goedde, Ph.D.

L.    Transcript of Deposition of Lauran Richard Schultz

### Third Party Testimony

M.    Declaration of Linda Bowles, Ph.D.

N.    Declaration of Mark W. Empie

### Other

O.    Declaration of Van H. Beckwith

P.    June 24, 2008 Letter from Stephen F. Sundlof, D.V.M., Ph.D., Director, Center for Food Safety and Applied Nutrition, Department of Health and Human Services to Gary L. Yingling, Counsel to the Enzyme Technical Association

Q.    July 3, 2008 Letter from Geraldine A. June, Supervisor, Product Evaluation and Labeling Team, Center for Food Safety and Applied Nutrition, Department of Health and Human Services, to Audrae Erickson, President, Corn Refiners Association

**DEFENDANT SNAPPLE BEVERAGE CORPORATION'S
OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

A district court must conduct a rigorous analysis when presented with a motion for class certification and must not certify a class unless the movant proves by a preponderance of the evidence that all the requirements of Rule 23 are met. For the reasons detailed below, Rule 23 is not satisfied here, and the Court should deny Plaintiffs' Motion for Class Certification.

## STATEMENT OF FACTS

### I.    Plaintiffs' Claims

Plaintiffs' Second Amended Complaint ("SAC") asserts claims against Snapple Beverage Corporation for violation of New York General Business Law Section 349, breach of express and implied warranty, and unjust enrichment. Plaintiffs allege that they paid a price premium attributable to all natural labeling on Snapple beverages and that the all natural label was misleading because the beverages were sweetened with high fructose corn syrup ("HFCS").

Plaintiffs seek monetary damages on behalf of a class they now define as "all persons or entities who, within the State of New York during the Class Period, purchased a Snapple beverage represented to be "All Natural" but that contained [HFCS]." Motion at 1. The Class Period extends from October 2001 to January 2009. *Id.* at n.4. The class definition, like the claims, has been a moving target. Plaintiffs first alleged that the class encompassed purchases anywhere in the United States, but abandoned that allegation in a November 9, 2009 letter to the Court. The SAC and the November 9, 2009 letter limit class members to "persons . . . who purchased for personal consumption and not for resale," but the Motion expands the class to "persons and entities" and eliminates the personal consumption restriction. Motion at 1.

Notably, the class is not limited to New York residents. It includes, among millions of others, commuters from neighboring states who bought a Snapple while working in New York,

foreign travelers who purchased Snapple while passing through New York airports, and tourists who bought Snapple while visiting the state.

## II. Plaintiffs' Testimony

As Plaintiffs' testimony shows, consumers bought Snapple teas and juice drinks for a variety of reasons unrelated to all natural labeling. They made their individual purchasing decisions, in a variety of retail settings, and paid widely varying retail prices.

### A.    Plaintiff Timothy McCausland

Mr. McCausland, a lawyer, lives with his family in rural Sullivan County. McCausland Dep. at 13. He drinks mainly diet sodas and teas. His choice of beverage depends on his health (less soda if his reflux is active), his mood, whether he has been exercising, and whether he needs hydration. *Id.* at 225, 227. For more than 20 years, McCausland has bought various brands of teas, including those made by Lipton, Nestea, and Snapple. *Id.* at 121. His choice among these depended on a "combination of things," including taste and his preference for glass bottles over plastic or cans. *Id.* at 47-48. He knows other people choose beverages for different reasons and that each choice reflects an individualized purchasing decision. *Id.* at 235-238.

Snapple's all natural label was not the "deciding factor" in his purchasing decisions. *Id.* at 221. McCausland concedes that inclusion of HFCS was "plain from the label" on Snapple. *Id.* at 290. When choosing Snapple, he liked that it was "New York-bred." *Id.* at 229:19. He also recognizes that Snapple positions itself as a funny brand, and he likes the "Snapple facts" on its caps. *Id.* at 147-148. Because of all the other factors influencing his decision, he probably would have bought Snapple over Lipton or Nestea, "regardless of whether it was labeled all natural." *Id.* at 241.

When buying Snapple, Mr. McCausland mostly bought single bottles from a convenience store in Rock Hill, occasionally bought tea drinks by the case, and sometimes purchased six-

packs. *Id*. at 124-125, 142. He remembers paying $1.79 per bottle at a Rock Hill gas station on one occasion, but he has no idea the per-case prices he has paid. *Id*. at 257, 124. He thinks he bought six-packs for between seven and nine dollars, and his wife used coupons to obtain a discount off the multi-pack price. *Id*. at 124-125.

A good friend of McCausland's, who is a partner in the firm representing Plaintiffs, told him about this lawsuit before it was filed. *Id*. at 35. After talking to his friend, McCausland read a few online articles about HFCS that he can't identify or remember, then decided to become a plaintiff. *Id*. at 32-34, 49. McCausland cannot describe the processes used to make HFCS, but views the components of HFCS (glucose and fructose) as natural and knows based on his research that nothing man-made is added to HFCS. *Id*. at 188, 202, 253. After talking to his friend, however, McCausland developed the view that HFCS is not a "naturally occurring product in nature" and therefore that it is "unfair" to call Snapple all natural. *Id*. at 44, 188:20-21. McCausland decided to "avoid" HFCS, but has not "cold turkey eliminated it" from his diet. *Id*. at 89:7-10, 167. Since joining the lawsuit, he has gravitated toward buying unsweetened drinks or artificially sweetened diet drinks. *Id*. at 239.

## B.    Plaintiff Evan Weiner

Evan Weiner lives and works in New Jersey as a customer support representative in New Jersey. Weiner Dep. at 8. Weiner bought Snapple tea drinks and juice drinks "hundreds of times" in New York and New Jersey. *Id*. at 150-151. He recognizes that choosing a beverage to purchase is a "very personalized decision for each person." *Id*. at 137. Weiner's primary motivating factor in choosing a drink was to "find something that tasted good." *Id*. at 163. There are "numerous reasons" he might choose one brand over another, including flavor variety. *Id*. Weiner also bought Snapple for the fun and humor associated with Snapple promotions and because Snapple beverages were refreshing and thirst-quenching. *Id*. at 133-134.

3

Mr. Weiner bought single bottles of Snapple from pushcart vendors and at convenience stores during regular trips into New York City, where prices would vary based on the location and type of the retailer. *Id.* at 136. He would pay less for a bottle of Snapple at a grocery store in New Jersey than at convenience store in Manhattan. *Id.* at 164. In New York City, he thinks he generally paid anywhere from $1.49 to $1.79 for a bottle of Snapple at a convenience store. *Id.* at 176. He could get the same bottle at his neighborhood grocery store in New Jersey for $.99, especially if he used a coupon or there was a special promotion. *Id.* at 164, 171. He says buying by the case at Costco resulted in savings of $.15 per bottle or so. *Id.* at 170.

Four or five years ago, while shopping for soft drinks in a New Jersey grocery store, Weiner decided that he would no longer consume HFCS "just as an experiment to [himself]." *Id.* at 18-19:1-4. Weiner reads labels "without fail." *Id.* at 82. Once he decided to forego HFCS, he discontinued buying caloric Snapple drinks because he could tell from the labels that they included HFCS. *Id.* at 83. Around this time, Mr. Weiner read various online articles about HFCS, but he can't identify them or say with any specificity what he read that helped form his opinion. *Id.* at 20-22, 96. Weiner understands that HFCS is made from corn, that the process for making HFCS does not employ any chemicals, and that the components of HFCS, glucose and fructose, are natural. *Id.* at 109-114. In 2005 or 2006, however, Weiner came to the personal view that HFCS is not natural. *Id.* at 98.

## C.    Putative Class Member Stacy Holk[1]

Stacy Holk commutes from New Jersey to her job on Wall Street. Holk Dep. at 10. She avoids diet drinks and started drinking Snapple tea and juice drinks when she was a kid. *Id.* at

---

[1]    Ms. Holk is the named plaintiff in a near-identical lawsuit filed against Snapple in the United States District Court for the District of New Jersey on behalf of a putative class of consumers who bought Snapple in New Jersey. *Holk v. Snapple Beverage Corp.*, No. 07-3018 (D.N.J.) Holk's counsel in the New Jersey case are also Plaintiffs' counsel here. Holk bought Snapple in both New York and New Jersey and her counsel has advised Snapple's counsel that she considers herself a member of both the New Jersey and the New York classes.

66, 76. She liked the taste and variety, the fact that Snapple's glass bottles were easily recyclable, the "Snapple facts" found under the Snapple bottle cap, and the humor associated with the brand. *Id.* at 260-262. Mrs. Holk did not buy Snapple solely because it was labeled "all natural." *Id.* at 260. In fact, she repeatedly testified that because she liked Snapple's taste, glass packaging, and brand association, she would have purchased Snapple between 2001 and 2007 even if it had not been labeled all natural. *Id.* at 318-321.

Ms. Holk cannot say which Snapple beverage she bought at any particular time, where or when she bought it, or what prices she paid. *Id.* at 171, 237-238. In just the area where she lives, there are 10-15 different retailers selling Snapple. *Id.* at 281. The prices at different retailers varied, and sometimes were lowered due to sales or other discounts. *Id.* at 177-178. The per-bottle sales price of the Snapple Ms. Holk says she bought during the class period could have ranged anywhere between one and two dollars. *Id.* at 177-178. She bought Snapple by the case if it was on sale. *Id.* at 169. Her mother, with whom she lives, used coupons to get a discount. *Id.* at 178.

Ms. Holk's mother works as a babysitter for an attorney at the law firm representing Plaintiffs in this matter. *Id.* at 48. In May of 2007, Holk's mother told her that the firm was pursuing litigation against Snapple for labeling beverages with HFCS as "all natural." *Id.* at 52, 65. Holk knew that HFCS was a commonly used sweetener that was present in many of the products that she enjoyed. *Id.* at 67-69, 72. After her conversation with her mother, she conducted internet research, had a telephone conversation with Plaintiffs' law firm, and became the named plaintiff in the New Jersey case. *Id.* at 83, 117-118, 154.

## III.   Snapple Beverage Corporation

### A.   Snapple's History and Its Marketing

Snapple was founded in New York's Greenwich Village in 1972. In the late 1980's,

Snapple introduced its teas and juice drinks to a beverage market then dominated by Coke, Pepsi and a handful of soft drink brands.  Mazur Dec. ¶ 4, Ex. 1.

In its early marketing and throughout the class period, Snapple consistently focused on flavor, innovation and humor in its advertising and promotions.  Currlin Dep. at 51-54; Mazis Rep. ¶ 4, 14-17.  Snapple's light-hearted and quirky advertising featured such things as Snapple bottles dressed in wigs, running with the bulls in Spain, attacked by robots and synchronized swimming.   Mazur Dec. Ex. 3, 12; Mazis Rep. ¶¶ 14-17.   Snapple's early spokespersons included Rush Limbaugh, Howard Stern, and Wendy "The Snapple Lady."  Motion Ex. 9 at SN3078.  Snapple chose flavors names—"Go Banana" and "What-a-Melon"—in keeping with its fun and humorous themes.   Motion Ex. 5 at SN2609, 2612.   Snapple's marketing and promotion barely mentioned -- let alone featured -- its all natural quality.  Currlin Dep. at 65-67; Mazis Rep. ¶¶ 14-17.[2]

Predictably, when asked what they valued in Snapple, consumers pointed to Snapple's "taste," "variety," and fun-filled personality.  Currlin Dep. at 51-52, 58-59, 181, 186-187.  ██

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Mazur Dec. Ex. 4; Mazis Rep. ¶¶ 9-12.

███████████████████████████████████████████████████████████████████

██████████████ *Id.* ██████████████████████████████████████████████

████████████████████████████████████████████ Mazur Dec. Ex. 4; Currlin Dep. at 178-185; Mazis Rep. ¶ 9.

In asserting that Snapple "focus[ed] on positioning its Snapple beverages as 'All Natural' throughout the Class period."  Motion at 3.  Plaintiffs' statement of "facts" is instead an

---

[2]    Plaintiffs admitted they could point to nothing misleading in Snapple's advertising and base their claims on labeling.  McCausland Dep. at 282-284, 288; Weiner Dep. at 34, 186-189.

argument—one unsupported by even a cursory read of the handful of documents from which Plaintiffs selectively extract a few words out of context. For example, a presentation titled "2004 Plan" lists ███████████████████████████████████████ Motion Ex. 5 at SN2635. None of the listed attributes relates to "all natural," and the remainder of the document focused on advertising and promotion of products such as "Snapple Pie" and a "Snaffle" promotion. Motion Ex. 5.

Plaintiffs also cite a 2005 Consumer Portraits presentation by an outside consultant who conducted "one-on-one" interviews with consumers in ████████████████████████ ██████████████████████████████████████ Motion Ex. 6. Those interviewed were not representative of all consumers—████████████████ ████████████████████████████████████ *Id.* at SN2104-2109. Even within the selected group, the consultant concluded from these interviews that ███████████████████████████████████████████ ████████████████ *Id.* at SN2134. The same interviews showed that these consumers perceived ████████████████████████████ and that Snapple's packaging, in consumers' eyes, ████████████████████████████ *Id.* at SN2129-2130.

Another lengthy presentation, anticipating developments in 2006, noted under the heading "what we do best" that Snapple is ████████████████████████████ ███████████████████████████████████████████ Motion, Ex. 8 at SN874.[3] Likewise, a 2006 presentation described past reasons why Snapple was successful, including ████████████████████████████ Motion Ex. 9 at SN3080. The document also highlighted

---

[3]        This document also discusses in detail ████████████████████████ ████████████████████ *Id.* at SN881-884. Plaintiffs ignore that those ████████████████████████████ *Id.* at 884.

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████ *Id.* at SN3091, 3095.[4]

These documents do not indicate that Snapple ever elevated "all natural" as a significant selling point or that a majority of consumers ever perceived it as a "core brand association." In fact, they prove that Snapple became known for flavor, variety, and quirky advertising, and they disprove that consumers' perception and opinions of all natural are uniform class wide. Dr. Michael Mazis, a marketing expert whose 35 year career includes significant work on behalf of the FDA and FTC, reviewed Snapple's advertising and marketing history, including the documents Plaintiffs cite, and concluded that "'all natural' messaging played almost no role in Snapple's advertising" and the all natural characteristic "was not a meaningful motivator for consumers to choose Snapple." Mazis Rep. ¶ 3-4.

## B.    Snapple's Teas and Juice Drinks[5]

A key contributor to the distinctive taste of Snapple teas and juice drinks is the absence of preservatives.  When Snapple entered the market in the late 1980s, most beverage makers used preservatives in teas and juice drinks to prevent against microbial contamination.  Snapple avoided using preservatives by pioneering the use of a "hot-fill" process, which uses high-temperature heat pasteurization to preserve products immediately before bottling.  Mains Dep. at 83-84.  Although the hot-fill process was more costly than the cold-fill process used by others, using hot-fill processing allowed Snapple to deliver superior flavors and taste and differentiate

---

[4]    Plaintiff cites to a 2006 Marketing Plan document for the proposition that ████████████
█████████████████████████████████████████████████████
████████████ Motion at 3.

[5]    Unless otherwise noted, "Snapple teas and juice drinks" and "Snapple products" refer to Snapple products labeled all natural and sweetened with HFCS.  Snapple products that are either not labeled all natural or not sweetened with HFCS are not at issue.

itself from products that added artificial flavors and preservatives.  *Id.* at 85.  Snapple also distinguished itself by using high quality 16-ounce glass bottles (instead of aluminum or plastic). These glass bottles were sealed with metal lug caps that, when opened, release the vacuum seal created by hot-fill processing and make the now iconic "pop."  *Id.*  The caps also offered a spot for what became the hugely popular "Snapple Facts."

Snapple's teas and juice drinks from their inception were sweetened with HFCS.[6]  Mains Dep. at 83, 94; Mazis Dec. Ex. B.  It is undisputed that Snapple never concealed or failed to disclose the presence of HFCS in its products.[7]  The words "high fructose corn syrup" appear in the printed ingredient list on the label of every beverage about which Plaintiffs complain.  Mains Dep. at 85-86, 92-93; Mazur Dec. Ex. 2.[8]  Because Snapple uses no artificial preservatives and uses natural sweeteners instead of artificial non-caloric sweeteners such as saccharin or aspartame, Snapple's teas juice drinks have always been labeled all natural.  *See* Mains Dep. at 83-86, 89-91.

Snapple's labeling of HFCS as a natural ingredient is reasonably based on the composition of the sweetener and accords with the opinions of food science experts and regulatory practice.  Mains Dep. at 81-82.  HFCS is made from corn, and its primary constituents are glucose and fructose, the same simple sugars that comprise table sugar and honey.  Montville Rep. at 5-6;  Mains Dep. at 81.

---

[6]      Before this lawsuit was filed, Snapple began a comprehensive relaunch and reformulation of its products. The changes included adopting taller, simpler glass bottles, refining graphics, focusing on fewer flavors, placing new emphasis on green and black tea, and sweetening with sugar.  Plaintiffs' counsel were advised of the relaunch immediately after they filed the first iteration of these lawsuits in June 2007.  They also were advised that because of bottle and label changes, the new products would take some time to arrive on store shelves.  The new products reached retailers in early 2009, and both Mr. McCausland and Mr. Weiner testified that they have no complaint with Snapple's current labels.  McCausland Dep. at 64; Weiner Dep. at 184.  The request for injunctive relief pleaded in the SAC is thus moot.

[7]      McCausland Dep. at 290; Weiner Dep. at 82, 184.

[8]      Each Plaintiff saw the label and knew the beverage contained HFCS before making his or her purchasing decision.  Weiner Dep. at 82-83; McCausland Dep. at 218-221, 248, 290.

> In terms of composition, HFCS is made of the sugars glucose and fructose (fruit sugar) which are commonly found in nature . . . are used as food ingredients, and are widely accepted as natural.
>
> The method of making HFCS from corn is natural. HFCS is made using naturally-occurring proteins that accelerate the breakdown of sugars. These proteins are known as enzymes. . . . Because HFCS is made by natural enzymes from natural corn to yield sugars that are common in nature, HFCS is natural.

Montville Rep. at 3.

It is untrue that Snapple "simply relied upon the assumption that since corn is a natural grain, and that is where HFCS comes from, HFCS must be natural." Motion at 4. Snapple understood the composition of the HFCS purchased from suppliers and reviewed suppliers' specifications. Mains Dep. at 40-42. Snapple requires suppliers to follow Snapple's specifications for HFCS and obtains supplier certifications confirming that their HFCS does not contain artificial or synthetic ingredients. *Id.* at 77, 87. [9] And Snapple conducts legal and regulatory department reviews of its labels. *Id.* at 87-88; Currlin Dep. at 177-178.

Labeling HFCS as natural is consistent with a twenty-year history of Food and Drug Administration policy and pronouncements. In 1993, the FDA announced in the Federal Register that it would "maintain its current policy . . . not to restrict the use of the term 'natural' except for added color, synthetic substances, and flavors as provided in § 101.22." 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993). The FDA's longstanding policy is that "natural" means that nothing artificial or synthetic has been included or added that would not normally be expected to be in the product. *Id.* The FDA has confirmed Snapple's understanding that HFCS is natural under this policy. In 2008, the FDA sent letters to both the Corn Refiner's Association and the Enzyme Technical Association stating that it would not object to the use of the term "natural" to describe

---

[9]     There is no basis for Plaintiffs' footnoted statement that "Defendant recognizes that HFCS is not a 'natural' ingredient." Motion at n.5. Plaintiffs cite only a few words relating to "new product development" from an 88-page document, the purpose of which is unknown. The author of the document, its context, and its purpose are all unidentified.

products containing HFCS.[10]  See Beckwith Dec. Exs. G, H.

### C.     Snapple's Distribution and Pricing

New York consumers never purchased directly from Snapple.  Instead, Snapple sells to independent and company-owned distributors who in turn sell to retailers who in turn sell to consumers.  Mazur Dep. at 28-29; Mazur Dec. ¶ 6.  Snapple consistently "line priced" its products such that wholesale list prices depended on the size of the bottle and the number of bottles in the package, not the drink type or flavor variety.  Mazur Dec. ¶ 7, Exs. 5, 6.  A case of 16-ounce all natural lemon tea, for example, had the same wholesale list price as a case of 16 ounce diet lemon tea, which had artificial sweeteners and was not labeled all natural.  *Id.*; *see also* Ugone Rep. ¶ 72.

Distributors of Snapple products also line price when selling to retailers, including grocery stores, convenience stores, mass merchants, drug stores, club stores, and food service accounts such as local delis.  Mazur Dec. ¶ 7.  Snapple does not set or control the retail prices that consumers pay for Snapple products.  Mazur Dep. at 30.  The retailers set their own price points.  *Id.*

### ARGUMENT

### I.     Plaintiffs Bear the Burden to Prove Class Certification Requirements.

A plaintiff seeking class certification must establish all four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b).  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008).  A district court must conduct a "rigorous analysis" and may not certify a class "without making a ruling that each Rule 23 requirement is met."  *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 27 (2d Cir. 2006) ("*In re IPO*").  The burden of proving

---

[10]     The FDA opined as to a particular method for making HFCS.  Snapple purchased HFCS from Archer-Daniels-Midland and Corn Products International, both of whom made HFCS in the manner approved as natural by the FDA. Mains Dep. at 37; Montville Rep. at 9-10; Empie Dec. ¶ 13; Bowles Dec. ¶ 5.

compliance with all the Rule 23 requirements rests with the movant. *Id.* at 40.  "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).  Making merely "some showing" of the requirements is insufficient. *Id.* In sum, the district court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *In re IPO*, 471 F.3d at 41.

## II.    Plaintiffs Have Failed to Prove That Common Issues Predominate.

Plaintiffs seek certification under Rule 23(b)(3), which requires proof of predominance, *i.e.*, that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members."    Fed. R. Civ. P. 23(b)(3).    To prove predominance, a plaintiff must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309 (S.D.N.Y. 2004) (internal quotation and citation omitted).    To find predominance, "a Court must consider the elements of each cause of action, and determine whether those elements can be satisfied by common, class-wide proof." *Id.* at 310.  "[A] court must deny certification where individual issues of fact abound." *Id.* at 309.  The requirement of "rigorous analysis" to ensure "actual, not presumed conformance" applies with "equal force to all Rule 23 requirements, including those set forth in Rule 23(b)(3)." *In re IPO*, 471 F.3d at 33 n.3.

### A.    Individualized Issues Dominate Plaintiffs' New York Consumer Protection Act Claim.

To recover under Section 349 of the New York Consumer Protection Act, a plaintiff must prove three elements: "first, that the challenged act or practice was consumer-oriented; second,

that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000). At least two of these depend on issues individual to class members.

### 1.    Causation and Injury Present Individual Issues.

#### a.    *Applicable law.*

An essential element of a Section 349 claim is that "the plaintiff suffer injury as a result of the deceptive act." *Stutman*, 731 N.E.2d at 612; *see also In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 310 (a plaintiff must prove "actual injury" to recover under Section 349). Where the requisite injury is not capable of proof at trial "through evidence that is common to the class rather than individual to its members," class certification is improper. *See In re Hydrogen Peroxide*, 552 F.3d 305, 311-312 (3d Cir. 2008). An assertion that class-wide injury is "conceivable" does not satisfy the standard of proof required to certify a class. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 38-39 (2d Cir. 2009). Alleged deception may not "serve both as act and injury." *Small v. Lorillard Tobacco, Inc.*, 94 N.Y.2d 43, 56 (1999).

In addition, "the alleged deceptive act must be the cause of the harm asserted." *Newman v. RCN Telecom Servs.*, 238 F.R.D. 57, 63 (S.D.N.Y. 2006). "The causation element is essential." *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 310. "Assessment of specific causation often dissolves into a 'myriad of individualized causation inquiries,'" precluding certification. *Id.* (citations omitted).

In *McLaughlin v. American Tobacco Co.,* the Second Circuit affirmed denial of class certification of RICO claims alleging misrepresentation of health benefits associated with light cigarettes, which allegedly caused consumers to purchase the product in artificially large quantities and at artificially high prices. *McLaughlin*, 522 F.3d at 220. The court concluded that

the plaintiff had failed to establish that common issues predominated with respect to loss causation. *Id.* at 226. The court concluded that the plaintiffs' theory—that "misrepresentation that Lights were healthier led to an increased market demand for light cigarettes, which drove up the price of Lights"—could not be established on a class-wide basis because "factors other than defendants' misrepresentation may have intervened and affected the demand and price of lights." *Id.* at 227. Thus, "determining the portion of plaintiffs' injury attributable to defendants' misrepresentation" would require individualized inquiry. *Id.*[11]

Individual causation issues also predominated in *In re Currency Conversion Fee Antitrust Litig.*, where the court denied class certification of Section 349 claims alleging that a credit card company's assessment of a currency conversion fee pursuant to a cardholder agreement violated the statute. 230 F.R.D. at 303, 311.

> To prove causation, each plaintiff must show that Citibank's disclosure of the conversion fees was inadequate, thus deceiving the cardholder into using his Citibank card for foreign purchases when other more economical options were available. Such a showing entails individual inquiries, including an examination of each cardholder's understanding and whether it was justified.

*Id.* at 311. The same was true of Section 349 claims in *Brissenden v. Time Warner Cable*, 885 N.Y.S.2d 879 (N.Y. Sup. Ct. 2009), where plaintiffs alleged that a cable television company's notice to new subscribers was deceptive and that the company systematically charged these customers for equipment that the company knew was unnecessary. Although all new customers received the same written notice, the court concluded that individual questions regarding whether cable subscribers were injured "overwhelm[ed] any common issues" because the injury determination was connected to consumer's knowledge. *Id.* at 887. A customer would not have suffered injury "if that customer wanted the equipment, the equipment actually improved

---

[11] Courts have applied *McLaughlin* to deny certification of other claims, including Section 349 claims, that require proof of causation and damages. *See, e.g., Dungan v. The Academy at Ivy Ridge*, 249 F.R.D. 413, 414-16 (N.D.N.Y. 2008).

reception or if that customer knew from other sources that this equipment was optional." *Id.* at 885.[12]

As is detailed below, in this case, even assuming that Snapple's label were misleading (an element also fraught with individual issues), the alleged injury and causation could only be proven through individual inquiries and are not susceptible to common proof. To certify a class of millions of unconnected people, then determine which few, if any, were actually injured by Snapple's labeling "would render the class action device nothing more than a façade for conducting a small number of highly individualized cases." *In re Canon Cameras Litig.*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) (denying class certification of claims for unjust enrichment, breach of implied warranty and section 349 arising from defective cameras).

b.   *Proving an alleged price premium, if any, would require individual inquiries because there is no uniform price class wide.*

Plaintiffs contend that they "paid a premium price for Snapple beverages based upon the representations that the beverages were 'all natural'" and that this alleged "premium price injury" is "susceptible to class-wide proof." Motion at 20. To support this argument, plaintiffs rely solely on a four-page "expert report" from Dr. Goedde, which is missing vastly more than it includes.

Dr. Goedde's report was prepared without benefit of any economic or empirical analysis of any kind. Goedde Dep. at 79, 81, 114-115, 130. He did not consider any actual Snapple beverage sales price during the seven-year class period, identify any comparable product sales prices, or make comparisons to any benchmark product. *Id.* at 114-115, 168-169. Dr. Goedde does not reference any experience of any class representative or give any example of any person

---

[12]      *See also Oswego Laborers' Local 214 Pension Fund v. Marine Bank, N.A.*, 85 N.Y.2d. 20 (N.Y. 1995) ("the Bank's liability under [Section 349] will depend, in part, on whether plaintiffs possessed or could reasonably have obtained the relevant information they now claim the Bank failed to provide).

anywhere who actually paid a "price premium" attributable to the all natural label on a Snapple beverage. *Id.* at 97-98, 109-112. Plaintiffs' theory is far more speculative than that rejected by the Second Circuit. *See McLaughlin*, 522 F.3d 228-231.[13]

Indeed, Dr. Goedde admits that the whole notion that all-natural labeling adds value resulting in ability to charge higher prices is not, as his report labels it, a "conclusion," but is instead merely his "hypothesis." *Id* at 135. He concedes that he has done no analytical work to test this hypothesis, and that only after constructing an economic algorithm and conducting empirical analysis (neither of which he has even begun to do) would he know whether his "hypothesis" were true or not. *Id.* at 146. Dr. Goedde's report merely describes an "approach" that could be used to test his hypothesis if a class were certified. *Id.* at 78-81. He is simply "assuming" that he could build an algorithm at some future date that would yield an answer that would apply to the class as a whole. *Id.* at 153. Dr. Goedde cannot identify what data he would rely on; whether or how factors like consumer perception, distribution structure, or other factors influencing price would be considered; or which "standard economic methods" he might employ to implement his approach. *Id.* at 168-170. He has not attempted to gather class-wide economic data, and when asked what class-wide economic data he would rely on for future analysis, he said "I don't know what data it would rely on. That's part of my analysis." *Id.* at 170:7-8.

Dr. Goedde doesn't know if his "approach" would work, and he concedes that one "drawback" to the approach is if the data does not support it. *Id.* at 247-249. For now, he doesn't know whether there is a price premium or a price discount associated with Snapple sales

---

[13]    Goedde has not spoken to or read the depositions of the Plaintiffs, and he does not know what prices they paid for Snapple. Goedde Dep. at 109-112. He has neither identified, gathered, nor reviewed any data that would enable him to identify Snapple pricing on a class-wide basis. *Id.* at 168-169. He has done no empirical analysis, no market study, no econometric modeling. *Id.* at 81, 114-115. To know whether there are conditions under which an all natural label could add incremental value or result in higher prices, he would have to wait for these kinds of investigation. *Id.* at 146. Contemporaneously with this Opposition, Snapple has moved to strike Dr. Goedde's report.

in New York during the class period. *Id.* at 304. Nor could he give any elaboration regarding factors or data that would be relevant to any future analysis under his "approach." Representative of his answers to nearly all questions on this topic are these responses to questions regarding whether consumer perception would be a factor:

> Q.    And you don't know as we sit here today . . . whether consumers' perceptions factor into your analysis, do you?
>
> A.    That's correct. I don't know.
>
> Q.    Until you build your empirical algorithm you are not going to know the answer to that, are you?
>
> A.    I'm going to use my approach to see whether those, whatever factors are important and identify them and use them to develop the analysis.
>
> ****
>
> Q.    And you don't even know whether your approach can answer that question, do you?
>
> A.    I will identify what characteristics are important using my approach. So I don't know what characteristics will be important until I apply my approach.

*Id.* at 185-186.[14]

As the Second Circuit confirmed in *McLaughlin*, the decision in *In re IPO* requires that Plaintiffs at least show that "they could, at trial, marshal facts sufficient to rely upon [their theory]." *McLaughlin*, 522 F.3d at 229. Plaintiffs here have not even attempted to make that threshold showing. Dr. Goedde is content to ignore all the evidence and data that is available to him now. Dr. Goedde's skeletal and untested speculation differs by orders of magnitude from the

---

[14]    Dr. Goedde asserts that "[a]nother way to assess the inherent price premium attributable to . . . promoting a product as 'All Natural' is to assess the inherent premium value placed on such claims by consumers at large." Goedde Rep. at ¶ 16. He claims that "analysis of studies and market research  . . . can be used to determine the increased value, standing alone, that a product realizes due to the perception of that product being natural." *Id.* ¶ 6. Dr. Goedde himself has conducted no such study or even an independent review of the literature, and he cites no studies by others supporting this speculation, let alone studies of actual purchases of Snapple products. Goedde Dep. 98-99, 208. Dr. Goedde's generalized reference to unspecified studies of consumer perception regarding products other than beverages is not a reliable basis to conclude that any such study could accurately or reliably determine a price premium attributable to Snapple's all natural labeling. Ugone Rep. ¶ 77-79. As in *McLaughlin*, a court considering this approach "would have to engage in a series of speculative calculations to ascertain whether, and in what amount, plaintiffs suffered a loss." 522 F.3d at 230.

expert testimony in the three securities cases on which Plaintiffs rely for the proposition that they "need only establish that they may be able to prove loss causation at trial."[15]  Motion at 21.

The evidence that Dr. Goedde disregards, moreover, demonstrates that whether any putative class member was injured as a result of alleged mislabeling cannot be determined by proof common to the class but instead depends on individual purchasing decisions.  Snapple's expert economist Dr. Ugone analyzed data (produced by Snapple and available to Plaintiffs) that was compiled by an objective third party—the Nielsen Company—concerning average retail prices for Snapple across four geographic areas in New York at various times during the class period.  Although the average price data cannot tell us what any given consumer actually paid for Snapple,[16] analysis of this data is relevant to show the following.

First, there is no uniform retail price for Snapple applicable to the class as a whole.  Consumers bought Snapple in grocery stores, convenience stores, drug stores, delis, stadiums, theaters, and at pushcarts.  They bought bottles, six-packs, and cases.  They used coupons and shopper loyalty cards.    Retail prices of Snapple products — an integral component in determining whether any class member paid a price premium — vary significantly depending on where, when, and in what size and package quantity the sale took place.  As the report prepared by economist Dr. Keith Ugone shows, the factors affecting retail prices include:

---

[15]     *Cf Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 103, 105, 108-109 (S.D.N.Y. 2009) (plaintiffs' expert conducted an analysis of market reaction to analyst reports utilizing a three-day cumulative abnormal return methodology, conducted an analysis to determine whether there were statistically significant price movements on days when analyst reports were published, and proposed five techniques for controlling for confounding factors)*See also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008) (plaintiffs' expert proposed event study to show that misrepresentations artificially inflated stock price and caused class wide damages); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280-281 (S.D.N.Y. 2008) (plaintiffs' expert conducted event study showing disclosures were associated with statistically significant price reactions).    In all three cases, the fraud-on-the-market presumption of reliance was applicable.

[16]     Average prices, by definition, represent an amalgam of actual purchase prices that were actually higher or lower than the reported average.  The Nielsen company reports estimated average retail price data by dividing the reported total sales for a beverage product by the number of units sold.  Mazur Dep. at 100-102.  This data is collected from a sampling of retail outlets and projected across a broader market.  *Id.*  The resulting average does not reflect the actual price that any retailer charged or "what a consumer paid at a given point in time." *Id.* at 101, 113.

- The type of retail outlet — for example, the average price for Snapple was ▮ less in a grocery store than a convenience store. Ugone Report Table 5.

- The purchase location — for example, in 2007, the average price for Snapple in New York City was ▮ less than in Syracuse. Ugone Report Table 7.

- Availability of discounted prices, coupons, buy-one-get-one free promotions, or usage of shopper loyalty cards — for example, in 2007, the average promotional price of Snapple lemon tea in New York grocery stores was ▮ lower than the average everyday price. Ugone Report Table 11.

- Bottle size and package type — for example, the 2006 average price of a 16-ounce bottle of all natural juice drinks in a New York City grocery store was ▮, but the average price of a 12-pack was ▮. Ugone Report Ex. 5.

These variations multiply when considering changes in price from week to week and year to year over the more-than-seven-year class period. These kind of variations are evident from Plaintiffs' anecdotal reports.[17]

Mr. Ugone's analysis demonstrates that what Mr. Weiner paid for a bottle of Snapple at Penn Station has no bearing on what Mr. McCausland's wife paid for a case of Snapple at a Rock Hill Sam's Club, or what any other consumer paid for Snapple at another retail outlet some time during the purported class period. To determine the actual price paid by any particular putative Class member (and whether there was any price premium paid attributable to the all natural labeling) would require consideration of multiple individual circumstances peculiar to that transaction. Ugone Rep. ¶¶ 7, 29-56. Where, as here, "a number of exogenous variables" bear on the relevant sales prices, and a court considering Plaintiffs' injury theory "would have to engage in a series of speculative calculations to ascertain whether, and in what amount, plaintiffs suffered a loss," class certification is improper. *McLaughlin*, 522 F.3d at 230 (2d Cir. 2008).

Second, while recognizing that average retail prices mask significant variation in actual prices, Dr. Ugone's empirical analysis shows not only that Snapple all natural beverages *did not command a premium* relative to comparable competing beverages without an all natural label,

---

[17]    *See* McCausland Dep. at 124-125, 142; Weiner Dep. at 136, 164, 170, 171, 176.

but also that, on average, the all natural beverages consistently sold at *prices lower* than comparable competing products without an all natural label.[18]  Ugone Rep. ¶¶ 8-10, 57-68.  This was true across geographic areas, sales channels, and time periods.  *Id.*

A third important piece of data relates to wholesale pricing.  Snapple sells to distributors who in turn sell to retailers who in turn sell to consumers.  Ugone Rep. ¶¶ 11, 69-72.  Snapple's wholesale prices to distributors are determined according to size, packaging, and distribution channel, not according to flavor or drink type.  *Id.*  Under this "line pricing," a package containing 24 16-ounce bottles for distribution in a particular channel carried the same wholesale price regardless whether the bottles were filled with all natural tea, diet tea, an all natural juice drink or a diet juice drink.  Like other available data, the fact that Snapple's wholesale pricing does not distinguish between all natural beverages and beverages that are not all natural rebuts Dr. Goedde's "hypothesis" that all natural products are "worth more than similar products that are not natural."  Goedde Rep. ¶ 5.  In fact, Dr. Ugone's analysis shows that at both the wholesale pricing level (where Snapple's line pricing did not distinguish between drink types) and the retail pricing level, there is no discernible or systematic price premium associated with the Snapple's all natural beverages as compared with its diet beverages, which are not all natural.  Ugone Rep. ¶ 11, 69-76.

    c. *Proving causation and injury requires individual inquiries into consumers' knowledge, opinions and purchasing decisions.*

In addition to ignoring pricing information, Dr. Goedde also fails to consider that the circumstances surrounding an individual consumer's purchasing decision determine whether or

---

[18]  Ugone carefully identified relevant comparators that were, like Snapple, in glass bottles, used the hot-fill method, and competed in the same market segment, but were not labeled all natural.  Ugone Report ¶¶ 58-59.  Based on these factors, he compared Snapple all natural tea drinks to competing Lipton and Gold Peak tea drinks without an all natural label, and he compared Snapple all natural juice drinks to competing Fuze and Sobe juice drinks without an all natural label.

not he was injured by an allegedly misleading label. Both the consumer's reasons for purchasing Snapple and his knowledge and opinions concerning HFCS may be determinative in the causation/injury analysis. Ugone Rep. ¶¶ 5-6, 29-34. Plaintiffs concede that the circumstances connected to their purchasing decisions may be quite different from others, and that there is no way to know without individual inquiry. McCausland Dep. at 148-150, 182, 235-237; Weiner Dep. at 122-124, 148-150. For "each individual" choosing a beverage represents a "different purchasing decision" based on different factors. McCausland Dep. at 235-238. These individual issues preclude class certification.[19]

It is undisputed that consumers buy Snapple for many reasons unrelated to whether the drink is all natural.[20]



Mazis Rep. ¶ 7. Consumers who bought Snapple for reasons unrelated to all natural and who would have bought the same beverage regardless of the label were not injured as a result of the label. For them, the all natural characteristic of the beverage is irrelevant, and the all natural label is immaterial. Ms. Holk, for example, testified that because she liked Snapple's taste, glass

---

[19]     *See Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-515 (7th Cir. 2006). In *Oshana*, a putative class asserted consumer protection claims alleging that Coca Cola had misled consumers into believing that Diet Coke had the same sweetener whether purchased from a fountain or in a can. The Seventh Circuit affirmed denial of class certification. The court observed that class membership required only purchase of a fountain drink, and that "countless members . . . could not show any damage, let alone damage proximately caused by Coke's alleged deception." *Id.* at 514. ("Some people may have bought fountain Diet Coke *because* it contained saccharin, and some people may have bought fountain Diet Coke *even though* it had saccharin.").

[20]     Mr. McCausland's choice of beverage, for example, depended on a "combination of things," the first of which was "taste." McCausland Dep. at 229, 259-260. In addition, he always prefers tea drinks in glass bottles to those in plastic or cans. *Id.* at 47-48, 111. He also liked that Snapple was "New York-bred." *Id.* at 229:19-20. For Mr. Weiner, finding something that tasted good was his primary motivating factor in choosing a drink. Weiner Dep. at 163. There were "numerous reasons" why he might choose one brand over another. *Id.* Snapple offered a greater variety of flavors and was generally his favorite. *Id.* at 131. Weiner also liked the fun and humor associated with Snapple promotions and found Snapple beverages to be refreshing and thirst-quenching. *Id.* at 133.

packaging, and brand association, she would have purchased Snapple between 2001 and 2007 even if it had not been labeled all natural. Holk Dep. at 318-320.

Whether a consumer was injured as a result of Snapple's all natural label also depends on the consumer's definition of "natural" and whether he viewed HFCS as natural. An individual who read Snapple labels, saw the inclusion of HFCS, viewed HFCS as unnatural, but bought the drink nonetheless was not misled or injured.[21]    That person knowingly bought beverages believing the drinks included what she perceived as an unnatural sweetener.[22] On the other hand, as Mr. McCausland concedes, a person who viewed HFCS as natural also was not deceived or injured by the label because to him, the label was not inaccurate. McCausland Dep. at 280.

Consumers hold many different opinions regarding the meaning of the term "all natural" or in some cases no opinions at all. Mazis Rep. ¶ 7. As Messrs. McCausland and Weiner's testimony shows, a consumer's opinions on whether HFCS is natural are affected by what he or she hears and reads.

- Mr. McCausland developed the view that HFCS is not natural only after talking to class counsel. McCausland Dep. at 43-44. McCausland's "personal definition for natural" is not based on any authoritative source, and he agrees that other people could have different opinions. McCausland Dep. at 188-190.[23]   Because he is

---

[21]    Ms. Holk read the labels and purchased Snapple beverages knowing that they included HFCS as an ingredient. Holk Dep. at 269, 275-276. According to her, the Snapple label "has everything you need to make a personal decision about whether to buy the product." *Id.* at 263. Weiner and McCausland also admit that Snapple labels at all times made clear that HFCS was an ingredient. McCausland Dep. at 218-221. They admit that Snapple has never hidden the fact that its caloric products were sweetened with HFCS, *id.* at 248, that the inclusion of HFCS was "plain from the label," *Id.* at 290, and that once they decided to avoid HFCS, they thereafter simply chose not to buy caloric Snapple drinks, Weiner Dep. at 83.

[22]    Obviously, because factors such as taste, variety, price, caloric content, and convenience drive consumers' purchases, they often buy products they view as non-natural. Although Mr. McCausland discontinued buying Snapple after joining this lawsuit, now he buys diet drinks that use artificial sweeteners. McCausland Dep. at 76-78, 239. When he is "in the mood," he buys drinks such as cranberry juice cocktail that he knows are probably sweetened with HFCS. *Id.* at 231. Mr. McCausland also continues to buy many other products that he knows contain HFCS, including pancake syrup, salad dressing, waffles, and condiments. McCausland Dep. at 165. McCausland also buys plenty of foods that he considers non-natural, such as Oreos and Twinkies. *Id.* at 172. Mr. Weiner also frequently chooses products that are not all natural. Weiner Dep. at 81.

[23]    For McCausland to determine whether something is natural, he would have to know its constituent elements and understand how it has been manufactured. *Id.* at 173, 195-196. His position on HFCS is difficult to reconcile with his testimony that he views the chemical constituents of HFCS as natural, he agrees that naturally

"not a scientist," McCausland has simply developed over time a "notion . . . as to what is natural and what is not." *Id.* at 250.

- After reading online articles about HFCS that he can't identify, Mr. Weiner came to the personal opinion that HFCS is not natural. *Id.* at 90, 95, 98, 117. He recalls that his research located some materials that considered HFCS to be natural and others that considered HFCS to be not natural. *Id.* at 97. Weiner admits that applying his definition of natural can be a "fuzzy line," *Id.* at 105, that respected professionals could hold views different from his, and that his view differs from that of the FDA, which he concedes is the "utmost authority in determining what is natural." *Id.* at 101.[24]

- Based on discussions with her lawyers and unidentified internet articles she consulted in 2007, Ms. Holk developed the opinion is that it is "misleading" to say that a product containing HFCS is "all natural." *Id.* at 96-97. Holk recognizes that this is her personal opinion and that reasonable minds could differ as to whether HFCS is natural. *Id.* at 195. She equates "natural" with "organic;" both are "not chemically altered." *Id.* at 209-210. Holk admits that someone who understands science could conclude that HFCS is natural. *Id.* at 212-213. She is unaware of the FDA's position on this topic. *Id.* at 98, 158.

Plaintiffs differ in how they apply their definitions of natural. Weiner Dep. at 98. Mr. McCausland does not view table sugar as natural; Mr. Weiner does.[25] And opinions can change. Mr. McCausland testified that he was unaware of the FDA's position on using the term natural in labeling products containing HFCS, but that regulators' views would probably be important to him going forward. McCausland Dep. at 62-63.

The only expert opinion before the Court regarding HFCS is from Rutgers food science professor Dr. Thomas Montville. Based on his knowledge and expertise, he classifies HFCS as natural because it is composed of simple sugars that are widely found in nature and is produced using natural enzymes that merely hasten natural reactions. Montville Rep. at 3-4.

At various times, federal regulators have received in public comments a "wide range of

---

occurring glucose and fructose could be combined and still be natural, and he knows based on his research that nothing man-made is added to HFCS. *Id.* at 188, 199, 202, 253.

[24]   Weiner understands that HFCS is made from corn, that the process for making it does not use any chemical, and that the components of HFCS, glucose and fructose, are natural and grow in nature. *Id.* at 109-114.

[25]   McCausland Dep. at 249; Weiner Dep. at 52-53.

ideas" as to what the term natural should or should not mean on a food and beverage label,[26] which confirms that consumer opinions vary. For more than twenty years, however, the FDA has consistently endorsed the policy that natural means "that nothing artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally be expected to be there."[27] Within the past two years, after in-depth review of information concerning the composition and production of HFCS, the FDA issued at least two letters stating that, in accordance with its long-held policy, the agency would not object to labeling products containing HFCS as natural.[28]

## 2. Determining Whether Any Consumer Was Misled In A Material Way Depends On Individualized Proof.

The individual inquiries described above are relevant not only to the causation and injury requirements, but also to the statutory requirement that Snapple's label must be "deceptive or misleading in a material way" to be actionable. *Oswego*, 85 N.Y.2d at 25. Under Section 349, a deceptive act is one "limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 26. To certify Section 349 claims for class treatment, however, "the proof must show that each plaintiff was reasonably deceived by the defendant's misrepresentations." *Solomon v. Bell Atlantic Corp.*, 777 N.Y.S.2d 50, 55 (1st Dep't 2004).[29] In *Solomon*, the court reversed certification of Section 349 claims on behalf of a class of New York residential consumers who subscribed to the defendant's internet service and alleged that the defendant's advertising had misrepresented the speed of the service. The appellate court

---

[26]    58 Fed. Reg. 2302, 2407 (Jan. 6, 1993).

[27]    56 Fed. Reg. 60421, 60467 (Nov. 27, 1991).

[28]    The FDA opined as to HFCS and the way it is made. The undisputed evidence shows that the HFCS in Snapple was obtained from one of two suppliers, both of whom made the HFCS in the manner blessed by the FDA. Mains Dep. at 37; Montville Rep. at 9-10; Empie Dec. ¶ 13; Bowles Dec. ¶ 5.

[29]    *See also Whalen v. Pfizer*, No. 600125105, 2005 WL 2875291, at *3 (N.Y. Sup. Ct. Sept. 22, 2005) ("[T]o satisfy the commonality requirement in a class action alleging [violation of section 349], the proof must show that *each* plaintiff was reasonably deceived by the defendant's misrepresentations and was injured by reason thereof.").

concluded that individual issues predominated.

> Even assuming that all members of the class saw the same
> advertisements, questions as to whether each individual was
> reasonably misled then predominate, given the alternative sources
> of information about DSL service that each may have had. . . .
> Thus, individual trials would be required to determine whether a
> reasonable consumer acting reasonably in each plaintiff's
> circumstances would have been misled by defendant's
> representations. *Id.* at 56.

Individual questions about whether putative class members were reasonably misled also

predominate here. Mr. Weiner, Mr. McCausland and Ms. Holk concede that their Section 349

claims depend not on objective or authoritative sources, but instead on their individual view of

the word "natural," their particular applications of their definition to their perceptions of HFCS,

and their own priorities in choosing a beverage. These plaintiffs admit that they only recently

formed the opinion that HFCS is not natural (in Mr. McCausland's and Ms. Holk's case, after

talking to class counsel). They agree that they have no expertise concerning the composition of

HFCS. There is no evidence that Plaintiffs' views, opinions and preferences are objectively

reasonable or are common to the class.

Whether any other class member was reasonably misled in a material way by Snapple's

labels cannot be decided on a class-wide basis, because those individuals' opinions, knowledge

and purchasing decisions are determinative in that analysis. The evidence negates Plaintiffs'

unsupported assumption that Snapple's labels "affected each consumer in the same way."

Motion at 17. To the contrary, Plaintiffs admit and the evidence shows that other people,

including other consumers as well as respected authorities and experts, have different

understandings of what the word "natural" and can and do disagree with Plaintiffs' recently

formed opinions that a drink sweetened with HFCS is not all natural. [30]  Plaintiffs further admit

that for "each individual" the choice among beverage options represents a "different purchasing

decision," and consumers buy Snapple for many different reasons, most of which have nothing to

do with whether the drink is labeled all natural.[31]  Plaintiffs admit that to know what other

consumers think and why they bought, one would have to ask them.[32]

The "core" of Plaintiffs' claim is not the words on Snapple's label, but the plaintiffs'

personal purchasing decisions and their own subjective and individual opinions about what

natural means and whether a beverage sweetened with HFCS is all natural.  In contrast, the four

cases on which Plaintiffs rely to argue that courts "readily" certify claims based upon a "core

representation" do not involve consumers' individual perception of subjective terms in making a

purchasing decision.  Rather, three of the cases involve bait and switch practices by service

providers.[33]  The fourth involved securities fraud claims arising from an initial public offering

prospectus.[34]  This case is also materially distinct from one in which a food manufacturer makes

a specific false statement about a product characteristic that is objectively verifiable or

---

[30]    The only expert testimony presented to the Court on this issue explains that HFCS is made from corn, includes no artificial ingredients or anything not also found in nature, and is properly considered a natural ingredient.  Further, the evidence shows that the Food and Drug Administration does not consider it misleading to label a beverage sweetened with HFCS as all natural.

[31]    McCausland Dep. at 238; Weiner Dep. at 137-138.

[32]    Weiner Dep. at 118-120, 122, 148; McCausland Dep. at 190-191.

[33]    In *Morrisey v. Nextel Partners*, a cellular phone service provider unilaterally increased a monthly fee to customers and notified them in billing statements.  The legal question was simply whether the typeface of the notice was so small and inconspicuous as to be deceptive.  2010 WL 653090, at *3.  Similarly, *Broder v. MBNA Corp.*, 722 N.Y.S.2d 369 (1st Dep't 2001), arose from a credit card company's practice of allocating cardholder's payments to cash advances that were subject to a lower interest rate rather than to the balance generated by purchases on the card that were subject to higher interest rates.  To defend the practice, the credit-card company relied on what the court described as an "small print footnote" that was "ambiguous."  *Id.* at 370.  In *Taylor v. Am. Bankers Ins. Group*, 700 N.Y.S.2d 458 (1st Dep't 1999), an insurance company offered easily available coverage in prominent print then rejected claims based on small, inconspicuous print describing the precise coverage terms.  Similar to these cases is *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418 (S.D.N.Y. 2009), which alleged that Best Buy advertised a price match guarantee policy but pursued an undisclosed policy of aggressively denying legitimate requests for price-matching.

[34]    *Pruitt v. Rockefeller Ctr. Prop.*, 574 N.Y.S.2d 672 (1st Dep't. 1991).  This case also is not about an omission in a "form contract" that allegedly failed to adequately disclose corporate policies.  *Cf. Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29 (E.D.N.Y., 2008) ("core of this lawsuit" is whether policy of back-dating memberships renewed within six dates following expiration was adequately disclosed to members in form contract).

disprovable.[35]

### 3. Determining Damages, If Any, Would Require Individualized Assessment.

The fact that damages would have to be ascertained on an individual basis is "a factor that [the court] must consider" in deciding whether common issue outweigh individual ones. *McLaughlin*, 522 F.3d at 231. Here, each of the individual issues discussed above in relation to liability—time and location of the purchase, package size, promotional prices, use of coupons, shopper loyalty cards, consumer knowledge, opinions, and reasons for purchase—also would have to be considered in connection with any damages determination. Even if a particular consumer could show that he paid a price premium attributable to all natural labeling, both Snapple prices and the differences in price between Snapple and benchmark comparators vary over time, across geographic regions, and between sales channels. Ugone Report at ¶ 7-10. No uniform price or price premium would apply to all members of the class. Plaintiffs' apparent expansion of the class definition to include "entities" and purchases made for the purpose of resale multiplies these individual damages issues.

Plaintiffs' Motion does not even offer a plan for calculating or distributing damages, if any. They rely solely on Dr. Goedde's report for the general proposition that damages can be calculated using "common evidence." Motion at 20. As discussed above and in Snapple's motion to strike, Dr. Goedde has not identified any such "common evidence" and his report is so

---

[35]     For example, in *Elias v. Ungar's Food Products*, 252 F.R.D. 233 (D.N.J. 2008), the defendant's packaging significantly understated the fat and calorie content of frozen veggie burgers and potato pancakes that were marketed to a particular consumer segment looking for healthy foods. *Id.* at 238. The factual misrepresentation was not apparent from the label, and the plaintiffs claimed that they would not have purchased the products had they known the truth. *Id.* In *Fitzpatrick v. Gen. Mills*, 263 F.R.D. 687 (S.D.Fla. 2010), Yoplait introduced a new yogurt distinguished by the addition of probiotics. *Id.* at 697. To draw consumers from Dannon's competing Activia product, Yoplait launched a nationwide marketing campaign to present the new product, which was priced significantly higher than regular Yoplait yogurt, as aiding in the promotion of digestive health. *Id.* at 691-692. Among other things, Yoplait represented that the probiotic was "clinically shown to support digestive health." *Id.* at 691. Based on evidence of a "conspicuous and common theme found in every Yo-Plus advertisement that the Court . . . reviewed," the court was "convinced that a significant number of Yo-Plus consumers purchased Yo-Plus because of its purported digestive health benefit." *Id.* at 697, 700.

plagued with deficiencies as to constitute no evidence.

In *McLaughlin*, the Second Circuit rejected a "fluid recovery" method, which involved determining collective damages on a class-wide basis and allowing individual class members to claim shares of this fund. *McLaughlin*, 522 F.3d at 231-233. The court held that this method would "alter defendants' substantive right to pay damages reflective of their actual liability" and violate due process by foreclosing "the right of defendants to challenge the allegations of individual plaintiffs." *Id.* at 232. Like the *McLaughlin* plaintiffs, Dr. Goedde has impermissibly "presumed" actual injury to "mask the prevalence of individual issues." *Id.* at 232-233. Dr. Goedde said that "an assumption [he is making]" is that every class member was injured regardless of the price they paid and regardless whether they read the Snapple label—even those who are of the opinion that HFCS *is* all natural. Goedde Dep. at 302-305. If Goedde's empirical analysis (which he has neither constructed nor performed) were to show and calculate a premium, he would distribute it "back to all the purchasers of Snapple," *id.* at 305, regardless why they purchased or how much they paid.

**B.    Individual Questions Dominate Plaintiffs' Warranty Claims.**

To recover for breach of express warranty, a plaintiff must prove that he or she relied upon the alleged warranty.[36] In *McLaughlin*, individual issues predominated where the claims asserted required proof of reliance, even though the claims arose from a "widespread and uniform representation" about the benefits of light cigarettes and the evidence included an internal marketing study showing that almost all smokers agreed that increasing acceptance of

---

[36]    *See CBS, Inc. v. Ziff-Davis Pub. Co.*, 553 N.E.2d 997, 1001 (N.Y. 1990); *J.C. Constr. Mgmt. Corp. v. Nassau-Suffolk Lumber & Supply Corp.*, 789 N.Y.S.2d 903, 903 (2d Dep't 2005). Plaintiffs cite *Sessa v. Riegle*, 427 F.Supp. 760 (E.D. Penn. 1977), which is not to the contrary. In an action under Pennsylvania law to recover for breach of warranties on the sale of a racehorse, the court questioned whether the seller's statement that the horse was "sound" was "part of the basis of the bargain," noting that this requirement "is essentially a reliance requirement." *Id.* at 766. The judgment for the seller was based in part on a finding that the buyer relied primarily on a third party, not the seller, to advise him regarding the purchase. *Id.* at 766-767.

light cigarettes was due to health assurances they seemed to offer. *Id.* at 221-223; *see also In re IPO*, 471 F.3d at 43 (finding that absent the presumption afforded by the fraud-on-the-market theory, which does not apply outside the securities litigation context, "individual questions of reliance would predominate over common questions" in a RICO suit).[37]

Individual reliance issues would predominate in this case too. The evidence shows that the vast majority of consumers bought Snapple for many reasons entirely unrelated to the all natural label. Mazis Rep. ¶¶ 2-4, 7-12. The only way to tell if a consumer relied on a Snapple label would be to examine the individual circumstances and personal knowledge of that consumer at the time of the purchase. In arguing that its breach of express warranty claim is susceptible to common proof, Plaintiffs mis-cite two cases, neither of which concerns warranty claims based on alleged misrepresentations.[38]

Individual causation, injury, and damages issues discussed above in connection with the Plaintiffs' Section 349 claim are equally applicable to Plaintiffs breach of express and implied warranty claims.[39] Plaintiffs concede that in connection with warranty claims, the fact finder would have to determine: "How much of a premium did Class members pay *due to defendant's breach*?" Motion at 23. As detailed with respect to the Section 349 claim, this question is bristling with individual issues, including whether the consumer purchased Snapple for reasons

---

[37]     *See also Klein v. Robert's Am. Gourmet Food, Inc.*, 808 N.Y.S.2d 766, 773 (2d Dep't 2006) (reversing and remanding certification order in part because trial court failed to address inclusion in class of consumers who did not rely on misrepresentations when purchasing products).

[38]     *In re Sony SXRD Rear Projection Television Class Action*, No. 06 CIV. 5173(RPP), 2008 WL 1956267 (S.D.N.Y. 2008), approved a settlement class in a case alleging design defects in televisions. *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d. Cir. 2002), was an antitrust action alleging that manufacturers had conspired to reduce inventories to raise prices. For the proposition that "issues of reliance do not defeat class certification," Plaintiffs cite an opinion granting summary judgment to defendants for breach of express warranty in a product liability case where the plaintiffs did not even "mention" express warranties in their summary judgment response. *Donald v. Shinn Fu Co, of Am.*, 2002 WL 32068351, *5 (E.D.N.Y. Sept. 4, 2002). Plaintiffs do not cite a single case for the proposition that it is "well-settled that individual reliance issues do not defeat a finding of predominance. Motion at 24. The quote Plaintiffs offer from Newberg on Class actions is taken out of context from a 70-page section of the treatise devoted to "common challenges to predominance."

[39]     *Cosy Goose Hellas v. Cosy Goose USA Ltd.*, 581 F. Supp. 2d 606, 625 (S.D.N.Y. 2008) (claim for breach of implied warranty of merchantability requires proof of damages proximately caused by the alleged breach).

unrelated to whether it was natural, the consumer's opinions regarding whether HFCS is natural, and myriad issues affecting the retail price paid.

In addition, certification under the implied warranty theory would be improper because, in non-personal-injury actions, "under New York law, absent privity of contract, a purchaser cannot recover mere economic loss against a manufacturer under a theory of breach of implied warranty."[40] It is undisputed that Plaintiffs did not purchase beverages directly from Snapple.[41]

### C.     Individual Questions Dominate Plaintiffs' Unjust Enrichment Claim.

To prevail on a claim for unjust enrichment under New York law, a plaintiff must establish "(1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) "The unjust enrichment inquiry focuses on the human setting involved and not merely on the transaction in isolation." *In re Worldcom, Inc.*, 371 B.R. 33, 38 (Bankr. S.D.N.Y. 2007) (citation omitted).   To recover under an unjust enrichment claim, a plaintiff must demonstrate that the "'benefits [plaintiff] received were less than what [the plaintiff] bargained for.'" *In re Canon Cameras Litig.*, 237 F.R.D. at 359-60 (citation omitted).   Here, individualized inquiries would be required to determine whether "equity and good conscience" require that each putative class member in this case be awarded restitution. *See Dungan*, 249 F.R.D. at 427 (holding that unjust enrichment claims "will require individualized proof as to each plaintiff's situation and an individualized analysis of 'equity' and 'good conscience'").[42]

---

[40]     *Hubbard v. General Motors Corp.*, No. 95 Civ. 4362, 1996 WL 274018, at *5 (S.D.N.Y. May 22, 1996) (citations and quotations omitted).
[41]     Weiner Dep. at 169; McCausland Dep. at 292-293.
[42]     *See also Whalen*, 2005 WL 2875291, at **4-5 (denying certification of unjust enrichment claim alleging that Pfizer misleadingly promoted Listerine as being "clinically proven to be effective as floss"); *In re Zyprexa Products Liability Litig.*, 671 F. Supp. 2d 397, 457 (E.D.N.Y. 2009) (denying certification of unjust enrichment

### D.    Defenses Present Individual Issues.

Snapple's defenses to Plaintiffs' claims also present individualized questions.    For example, knowledge on the part of individual consumers may give rise to defenses based on the "voluntary payment doctrine" or similar recovery-precluding principles.[43]    Many consumers, including Plaintiffs, recognized that Snapple was sweetened with HFCS, which was listed as an ingredient on the label.    In addition, because the class period extends to Snapple purchases as far back as 2001, laches could bar stale claims.[44]

The putative class also includes claims that are clearly time-barred by statutes of limitations.[45]    For example, consumers who read Snapple labels and had knowledge of the allegations in the SAC more than three years before it was filed have no viable claim under Section 349.    Plaintiffs' failure to offer any means of collectively determining how many class-members' claims are time-barred also counsels in favor of denying class certification.    *McLaughlin*, 522 F.3d at 233-234.

### III.    Plaintiffs Have Failed to Prove That the Proposed Class Is Ascertainable.

"Although Rule 23(a) does not expressly require that a class be definite in order to be certified, a requirement that there be an identifiable class has been implied by the courts. This

---

claim and finding that "individualized proof is required to overcome the possibility that Zyprexa was prescribed for a valid, medically necessary reason").

[43]      *See Solomon*, 77 N.Y.S.2d at 56 (voluntary payment doctrine "bars recovery of payments voluntarily made 'with full knowledge of the facts'"); *Newman*, 238 F.R.D. at 78; *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 308-309 (citing defenses based on notice); *Ballas v. Virgin Media, Inc.*, No. 600014-2007, 2007 WL 4532509, at *4 (N.Y. Sup. Ct. Dec. 6, 2007) ("No claim can be made pursuant to [Section 349] when the allegedly deceptive activity or practice is fully disclosed.").

[44]      *See Matter of Schultz v. State of New York*, 81 N.Y.2d 336, 348 (N.Y. 1993).

[45]      Claims under section 349 are governed by the three-year statute of limitations in N.Y. C.P.L.R. § 214(2). *See Gaidon v. Guardian Life Insurance Co. of America*, 96 N.Y.2d 201, 210 (2001).  Claims for breach of express and implied warranty are either governed by the four-year statute of limitations provided in N.Y. U.C.C. § 2-725 (2001), *Couser v. Rockwell International, Inc.*, 536 N.Y.S.2d 965, 966-67 (N.Y. Sup. Ct. 1989), or by the six-year statute of limitations provided in N.Y. C.P.L.R. § 213(2) (governing "an action upon a contractual obligation or liability, express or implied . . . .").  Claims of unjust enrichment are governed by the six-year statute of limitations provided in N.Y. C.P.L.R. 213(2) (2003).  *Congregation Yetev Lev D'Satmar Inc., v. 26 Adar N.B. Corp.*, 596 N.Y.S.2d 435, 437 (2d Dep't 1993).

implied requirement is often referred to as 'ascertainability.'" *Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 181 (S.D.N.Y.2005) (citations and quotations omitted).  The description of the class must be sufficiently definite so that it is "administratively feasible for the Court to determine whether a particular individual is a member." *Cortigiano v. Oceanview Manor Home For Adults*, 227 F.R.D. 194, 207 (E.D.N.Y.2005) (citation omitted).

Plaintiffs offer no explanation for how the Court could identify members of the proposed class, which is scattered around the country and across the globe.[46]  The class definition encompasses a mother who bought a case of Snapple in 2001 at an Albany Costco, a student who bought Snapple six-packs at an Ithaca grocery store in 2002 and now lives in Washington D.C., a New Jersey commuter who bought one bottle of Snapple from a street vendor outside Penn Station in 2003, a tourist from Texas who picked up several Snapple drinks for her family at a drug store before 2004 a Broadway show, and a European business traveler who bought a bottle of Snapple while passing through JFK airport in 2005.

Each of these persons and millions of other putative class members may or may not remember accurately whether or not they have ever bought Snapple.  Even if they were to accurately remember one Snapple purchase, they almost certainly would not remember every such purchase (and whether it was an all natural beverage as opposed to a diet or unsweetened one) dating back nine years ago.  Even for someone who does self-identifies as a class member,

---

[46]     The affidavit of Mr. Schultz expresses only that he is "confident" that his employer could "develop and implement an effective notice program" if a class were to be certified.  Motion Ex. 13.  Schultz offers no opinion regarding ascertainability or any other Rule 23 requirement, but concedes that Snapple was "consumed by millions and millions of people" and would present "a large and broad target audience" for his hypothetical notice program, which he has not begun to design and as to which he cannot even give a ballpark cost estimate.  Schultz Dep. at 124; Schultz Rep. ¶ 22.  Schultz's objectivity is as questionable as his opinions are speculative and irrelevant.  All the key executives of his employer Hilsoft Notifications, a legal notice and claims administration consultant, defected in the past two years, reducing the firm's employees from 10 to 4.  *Id.* at 74.  Nearly all the experience listed in the resume attached to Schultz's report predates his employment or is attributable to employees who have since left.  Schultz himself has never appeared in court as an expert and signed his first expert opinion last year.  *Id.* at 19, 80.  He has worked in two previous cases with Plaintiffs'' counsel, however, and that firm is on the list of targets from whom the current iteration of Hilsoft hopes to develop business.  *Id.* at 76.  Snapple has moved to strike Mr. Schultz's affidavit.

there are likely to be no objective means of verifying inclusion in the class.[47]

## IV.    Plaintiffs Have Failed To Prove Typicality and Commonality.

A court must consider typicality to ensure that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  To satisfy typicality for class certification of Section 349 claims, "the deceptive act described in the class description must be the same act that caused the harm to the proposed representatives." *Newman*, 238 F.R.D. at 64 (denying class certification of claims alleging internet provider misrepresented speed of service where class representative chose provider primarily because of price, not speed).  As in *Newman*, Plaintiffs here have not shown that their purchasing behavior is typical of the class.  As detailed above, neither Mr. McCausland nor Mr. Weiner bought Snapple principally because of the all natural labeling.  In addition, their behavior indicates that they were not misled.[48]

At a minimum, McCausland and Weiner are not typical of class members who purchased Snapple after this lawsuit was filed in October 2007.  The alleged class purportedly encompasses persons who purchased Snapple teas or juice drinks as late as January 1, 2009.  Motion at 1 and n.4.  As detailed above, by 2005 or 2006, Mr. Weiner knew that caloric Snapple drinks were sweetened with HFCS, had come to the opinion that HFCS was not natural, and was choosing not to buy Snapple.  By 2006 or 2007, the same was true for Mr. McCausland.  These individuals also are not typical of either "entities" that may be included in the class or persons or entities who purchased Snapple for resale.

---

[47]    Mr. McCausland  has no way to quantify how much Snapple he bought over the last ten years, and he has no receipts for his purchases.  McCausland Dep. at 229-230, 292.  Mr. Weiner also has no receipts that show the price he paid for Snapple at any time.  Weiner Dep. at 198.

[48]    Both agree that Snapple labels at all relevant times made clear that HFCS was an ingredient; that Snapple has never hidden the fact that its caloric products were sweetened with HFCS; and that the inclusion of HFCS was "plain from the label."  McCausland Dep. at 218-221, 248, 290; Weiner Dep. at 83.  After Mr. Weiner came to his personal opinion that HFCS is not natural, he discontinued buying the product.  Weiner Dep. at 83.  Similarly, after talking to Plaintiffs' counsel in the summer of 2006 or 2007, Mr. McCausland quit buying Snapple.  McCausland Dep. at 215-216.

## V.    Plaintiffs Have Failed to Prove Superiority.

Certification under Rule 23(b)(3) requires proof of superiority, i.e., that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007). Factors relevant to the superiority of a class action typically include:

> (a) the interest of class members in individually controlling the prosecution of separate actions, (b) the extent and nature of any litigation concerning the controversy already commenced by members of the class; (c) the desirability or undesirability of concentrating the litigation of claims in a particular forum; and (d) *the difficulties likely to be encountered in management of a class action*. Fed. R. Civ. P. 23(b) (emphasis added).

Here, the fourth factor weighs overwhelmingly against class certification. The enormous and geographically dispersed proposed class is inherently unmanageable. As detailed above, determining the claims asserted would require innumerable mini-trials to establish the differently situated circumstances of millions of different consumers who are otherwise unconnected and who bought Snapple for different reasons, in different places, at different times, for different prices. The insurmountable hurdles of ascertaining a class and determining liability issues would be matched by intractable problems associated with identifying and distributing any damages.

Plaintiffs argue that a class action would be superior because "relatively small damages" would inhibit individuals from seeking redress. Even assuming that alleged individual damages were small,[49] that factor does not outweigh the overwhelming individual inquiries that would render the litigation impossible to manage. This is especially true where a plaintiff asserts a Section 349 claim, which is a statute crafted as a viable mechanism for claims of modest value.[50]

---

[49]    As discussed above, it is highly doubtful that any individual has been injured at all by Snapple's labeling because there is no evidence that a price premium ever existed. In addition, Plaintiffs have not provided any plan or method by which they intend to calculate or distribute damages.

[50]    For many of the putative class members, if they had a valid claim under Section 349, recovery in a separate action under the statute would surpass recovery in a class action. In an individual action under Section 349, each

Plaintiffs' assertion that "no other related cases have been identified" and that "this is the only matter pending on behalf of the putative Class" is not accurate.  Motion at 25.  In fact, Plaintiffs' counsel filed Ms. Holk's essentially identical case in New Jersey.[51]  The proposed class members in that case—purchasers in New Jersey—overlap those in this one.  Mr. Weiner and Ms. Holk, for example, each bought Snapple in both places.

Finally, the class action device is not superior because the principal purpose of this lawsuit appears to be not to remedy tangible economic losses by individuals, but instead to effect policy change to suit their particular views.  Plaintiffs essentially want the court to act as a de facto regulator.  In Mr. Weiner's view, "the whole point" of the case is "to stop companies from labeling products with HFCS as all natural."  Weiner Dep. at 41.  He likened it to banning smoking in restaurants.  *Id*.  Likewise, McCausland says he signed on as a named plaintiff "to . . . change *other companies* from not having all natural where corn syrup's on the label."  McCausland Dep. at 61 (emphasis added).  A tort class action, lacking the public comment, group deliberation, investigative resources, and compulsory process attached to regulatory action, is not the appropriate vehicle, let alone a superior one, with which to make beverage labeling policy for Snapple or any other beverage maker.

## CONCLUSION

For the above-stated reasons, the Court should deny Plaintiffs' motion for class certification.

---

successful plaintiff is entitled to recover $50 even if his or her actual damages are less.  N.Y. Gen. Bus. § 349(h).  In a class action, however, a plaintiff's recovery under Section 349 is limited to actual damages.  *See* N.Y.C.P.L.R. § 901(b).

[51]    Two similar cases were filed in California and consolidated.  No. 2:09-CV-00606-FCD-EFB (E.D.Cal.).

Dated:   April 9, 2010.                By:   _____
                                              Van H. Beckwith
                                              **Baker Botts L.L.P.**
                                              2001 Ross Avenue
                                              Dallas, Texas  75201
                                              (214) 953-6500
                                              and
                                              Seth T. Taube
                                              Maureen P. Reid
                                              **Baker Botts L.L.P.**
                                              30 Rockefeller Plaza
                                              New York, New York  10112
                                              (212) 408-2500

                                              *Attorneys for Defendant*
                                              *Snapple Beverage Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of April, 2010, I caused the foregoing document to be

served by Federal Express on the following counsel:

                          Daniel R. Lapinski, Esq.
                          Philip A. Tortoreti, Esq.
                          **Wilentz, Goldman & Spitzer P.A.**
                          90 Woodbridge Center Drive
                          Woodbridge, New Jersey 07095
                          *Attorneys for Plaintiffs*

                          _____
                          Van H. Beckwith