UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
EVAN WEINER and TIMOTHY McCLAUSLAND,    :
on behalf of themselves and all others  :
similarly situated,                     :       07 Civ. 8742 (DLC)
                        Plaintiffs,     :
                                        :       SEALED OPINION &
             -v-                        :            ORDER
                                        :
SNAPPLE BEVERAGE CORPORATION,           :
                        Defendant.      :
                                        :
----------------------------------------X

APPEARANCES:

For plaintiffs:

Daniel R. Lapinski
Lynne M. Kizis
Philip A. Tortoreti
Wilentz, Goldman & Spitzer P.A.
90 Woodbridge Center Drive
Woodbridge, NJ  07095

Michael Halbfish
Tunney & Halbfish
245 Main Street
Woodbridge, NJ 07095

For defendant:

Van H. Beckwith
Ryan L. Bangert
Baker Botts LLP
2001 Ross Avenue
Dallas, TX 75201

Seth T. Taube
Maureen P. Reid
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112

DENISE COTE, District Judge:

This case concerns whether defendant's labeling of its teas and juice drinks as "All Natural," despite their inclusion of high fructose corn syrup ("HFCS"), was misleading to consumers. The plaintiffs move for class certification pursuant to Rules 23(a) and (b)(3), Fed. R. Civ. P.  For the following reasons, the motion is denied.

BACKGROUND

A.   Snapple Beverage Corporation

Defendant Snapple Beverage Corporation ("Snapple") was founded in New York's Greenwich Village in 1972.  Snapple began selling and marketing its teas and juice drinks in the late 1980s.  In marketing its beverages, Snapple focused on, among other things, flavor, innovation, and humor.  Snapple became known for its quirky personality and funny advertising, as well as its colorful product labels and beverage names.  For instance, Snapple's television advertisements featured, among other silly things, Snapple bottles dressed in wigs and hats, singing in a "boy-band," running with the "bulls"[1] in Spain, saving the world from a mad scientist, being attacked by robots, and performing synchronized swimming.  Snapple also built brand

---

[1] The "bulls" were played by hamsters with fake horns in the commercial.

loyalty through promotions like the "Snaffle" and the "Snapple Yardsale."

Most relevant to this action, Snapple labeled and marketed its teas and juice drinks as being "All Natural."  When Snapple entered the beverages market in the late 1980s, it avoided putting preservatives, which were then commonly found in similar beverages, in its teas and juice drinks.  Snapple was able to do so by using a "hot-fill" process, which uses high-temperature heat pasteurization to preserve products immediately before bottling.  Snapple also used 16-ounce glass bottles instead of aluminum cans or plastic.  The glass bottles are vacuum-sealed with metal lug caps, the underside of which features "Snapple Facts" on a variety of topics.

From their inception, Snapple's beverages were sweetened with HFCS.[2]  HFCS is made from corn and its primary constituents are glucose and fructose, the sugars that comprise table sugar and honey.  It is undisputed that Snapple disclosed the inclusion of HFCS in the ingredient list that appears on the label of every bottle of Snapple that was labeled "All Natural."

Snapple does not sell its teas and juice drinks directly to consumers.  Instead, Snapple sells to independent and company-owned distributors who sell to retailers, who in turn sell to

---

[2] Since early January 2009, Snapple's "All Natural" teas and fruit drinks have been sweetened with sugar, not HFCS.

consumers.  Snapple "line prices" beverages that it sells to its distributors.  Line pricing involves assigning a single, uniform price to all products sold in identical quantities.  For instance, all 24-packs of 16-ounce glass Snapple products, regardless of flavor or whether they are regular or diet, are priced identically for sale to distributors.  Thus, a case of 16-ounce "All Natural" lemon tea had the same wholesale list price as a case of 16-ounce diet lemon tea, which had artificial sweeteners and was not labeled "All Natural."  Likewise, distributors of Snapple beverages line price when selling to retailers.  Retailers set their own prices for Snapple beverages.  Thus, Snapple does not have any control over the prices that consumers ultimately pay for its beverages.

B.    The Plaintiffs

Plaintiffs Evan Weiner ("Weiner") and Timothy McCausland[3] ("McCausland," and with Weiner, the "plaintiffs") are purchasers of Snapple beverages sold in New York state.  Plaintiffs allege that they paid a price premium for Snapple beverages as a result of the "All Natural" labeling.  Plaintiffs contend that Snapple's "All Natural" labeling was misleading because Snapple

---

[3] McCausland's name is spelled "McClausland" in the complaint and caption.  The correct spelling, as indicated in the transcript of his deposition, is "McCausland."

beverages were sweetened with HFCS.[4]  Plaintiffs assert claims

for violation of N.Y. Gen. Bus. L. § 349, unjust enrichment, and

breach of express and implied warranty.  Plaintiffs seek damages

on behalf of a putative class that consists of:

> All persons and entities who, within the State of New
> York, purchased for personal consumption and not for
> resale or assignment, a Snapple beverage marketed,
> advertised and promoted as "All Natural," but that
> contained [HFCS], from October 10, 2001 to January 1,
> 2009.[5]

Based on this definition, the class is not limited to New York

residents, but includes, among millions of others, commuters

from neighboring states, college students studying in New York,

foreign travelers passing through New York airports, and

tourists who purchased a Snapple beverage while in New York.

Nor is the class limited by type of retailer that sold Snapple,

and thus includes consumers who purchased Snapple beverages at,

---

[4] Plaintiffs' claims are directed only at Snapple's caloric
beverages that were labeled "All Natural" and contained HFCS.
Snapple's diet beverages, which were artificially sweetened and
were not labeled "All Natural," are not at issue here.

[5] The Second Amended Class Action Complaint, which is the
operative pleading, originally defined the putative class to
include "[a]ll persons residing in the United States, except
the State of New Jersey."  By letter dated November 6, 2009,
plaintiffs advised that they intended to seek only a New York
state class.  In their motion for class certification,
plaintiffs again modified the class definition to presumably
include non-United States residents, as well as "entities," who
purchased an "All Natural" Snapple beverage within New York
state during the class period.  The plaintiffs have not defined
"entities" or explained what that term encompasses.

among other places, grocery stores, mass merchandisers, drug
stores, movie theaters, push cart vendors, and vending machines.

The potential diversity among putative class members is
apparent even among the named plaintiffs.  Weiner lives and
works in New Jersey.  He bought Snapple beverages "hundreds of
times" in New York and New Jersey.  For Weiner, there were
"numerous reasons" why he might have purchased Snapple beverages
instead of its competitors, but his primary motivation was to
"find something that tasted good."  Weiner also bought Snapple
because of Snapple's humorous promotions, flavor offerings, and
because Snapple beverages were refreshing and thirst-quenching.

Weiner bought single bottles of Snapple from pushcart
vendors and convenience stores while he was in New York City at
various times during the class period.  For instance, Weiner
recalls purchasing a Snapple juice drink in 2003 or 2004 at Penn
Station.  He does not know exactly what price he paid, but
believes it was between $1.50 and $1.75.  The prices Weiner paid
for Snapple varied based on the location and type of retailer,
but he thinks that he generally paid between $1.49 and $1.79 per
bottle for the Snapple beverages that he bought at convenience
stores in New York.  Weiner last purchased a Snapple beverage
that was labeled "All Natural" and that contained HFCS sometime
in 2005.

The other named plaintiff, McCausland, is a lawyer and lives in rural Sullivan County, New York.[6]  For more than twenty years, McCausland has bought various brands of teas, including those produced by Snapple.  When choosing among Snapple and its competitors, McCausland considered a "combination of things," the first of which was taste.  He also prefers teas that come in glass bottles rather than plastic or aluminum cans.  For McCausland, Snapple's "All Natural" label was not the "deciding factor" in his purchasing decision.  In fact, he would have bought Snapple over other teas and juice drinks "regardless of whether it was labeled 'All Natural.'"  McCausland chose Snapple because, among other things, he liked that it was "New York-bred," that it was a "funny" brand, and because he liked the "Snapple Facts."  He acknowledges that it was "plain from the label" that Snapple's "All Natural" beverages contained HFCS.

When purchasing Snapple, McCausland mostly bought single bottles from a convenience store, occasionally bought cases, and sometimes purchased six-packs.  He recalls paying $1.79 per bottle at a Rock Hill, New York, gas station on one occasion, but has no idea what price he paid for the cases of Snapple that he purchased during the class period.  McCausland also believes that he bought six-packs of Snapple for between seven and nine

---

[6] McCausland's close friend, who is a partner in the law firm that represents plaintiffs in this action, told him about this lawsuit before it was filed.

dollars, and his wife sometimes used coupons to obtain a discount off the multi-pack price.  McCausland has no way to quantify how much Snapple he purchased during the class period. He has no receipts or other records for his Snapple purchases, which were generally made with cash.  McCausland last purchased a Snapple beverage that was labeled "All Natural" and that contained HFCS in the summer of 2006 or 2007.

Putative class member Stacy Holk ("Holk")[7] lives in New Jersey and works on Wall Street.[8]  She started drinking Snapple beverages when she was a child.  Holk was attracted to the taste and variety of Snapple beverages, the glass bottles, the "Snapple Facts," and the humor associated with the Snapple brand.  Holk did not purchase Snapple because it was labeled "All Natural."  In fact, because she liked Snapple's taste, glass bottle, and brand, she would have purchased Snapple even if it were not labeled "All Natural."  Holk acknowledges that

---

[7] Holk is the named plaintiff in a nearly identical lawsuit filed against Snapple in the United States District Court for the District of New Jersey on behalf of a putative class of consumers who purchased "All Natural" Snapple beverages in New Jersey.  Holk v. Snapple Beverage Corp., No. 07 Civ. 3018 (MLC) (D.N.J.) ("Holk").  Holk is represented in the New Jersey action by plaintiffs' counsel in this action.  Like Weiner, Holk purchased Snapple in both New York and New Jersey, and thus she is a putative member of both the New York and New Jersey classes.

[8] Holk's mother, who works as a babysitter for an attorney at the law firm that represents plaintiffs in this action, told Holk about this lawsuit before it was filed.

Snapple's labels disclosed that HFCS was an ingredient in its "All Natural" beverages.

Holk does not recall which Snapple beverages she bought, where or when she bought them, or what prices she paid.  She recalls that the prices at different retailers where she purchased Snapple varied, and sometimes were lowered due to sales or other discounts.  Holk believes that the per-bottle price that she paid during the class period could have ranged anywhere between $1.00 and $2.00.  Holk also bought Snapple by the case if it was on sale.  Like Weiner and McCausland, Holk does not have any receipts or other records for her Snapple purchases.

C.   Procedural History

On October 10, 2007, Weiner filed a class action complaint against Snapple seeking certification of a nationwide class of consumers who purchased Snapple beverages labeled "All Natural" and that contained HFCS, exclusive of consumers whose purchases were made in New Jersey.  On November 7, Snapple moved to dismiss.  On November 20, a first amended complaint was filed which named McCausland as an additional plaintiff.

On December 7, the action was stayed pending the outcome of an appeal of the dismissal of a nearly identical action concerning purchases of Snapple's "All Natural" beverages in New

Jersey.  See Holk v. Snapple Beverage Corp., No. 07 Civ. 3018 (MLC), 574 F. Supp. 2d 447 (D.N.J. 2008).  On August 12, 2009, the Court of Appeals for the Third Circuit reversed the district court's dismissal in Holk and remanded for further proceedings. See Holk v. Snapple Beverage Corp., 575 F.3d 329 (3d Cir. 2009). By letter dated September 9, Snapple advised that it would not appeal the Third Circuit's decision.  On October 2, plaintiffs filed a second amended complaint and on October 15, Snapple answered.

Discovery closed on February 26, 2010.  On March 12, plaintiffs moved for class certification, which became fully submitted on April 30.  On April 9, Snapple moved to exclude the testimony of two of plaintiffs' expert witnesses, Dr. Alan Goedde ("Goedde") and Lauran Schultz ("Schultz"), offered in support of plaintiffs' class certification motion.  On April 27, plaintiffs moved to exclude the testimony of one of Snapple's expert witnesses, Dr. Keith Ugone ("Ugone"), offered in opposition to class certification.  The parties' motions to exclude expert testimony were fully submitted on May 14.[9]

---

[9] Because Snapple sought to redact and file certain briefs and exhibits under seal, the parties' motion papers were filed and docketed on dates later than they were served.

DISCUSSION

A.   Requirements for Class Certification

"[A] district judge may not certify a class without making a <u>ruling</u> that each Rule 23 requirement is met."  <u>McLaughlin v. Am. Tobacco Co.</u>, 522 F.3d 215, 221 (2d Cir. 2008) (citation omitted).  Thus, the plaintiffs will be able to sue Snapple as representatives of a class

> only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P 23(a); <u>see</u> <u>Brown v. Kelly</u>, No. 07-3356-cv, -- F.3d --, 2010 WL 2520040, at *5 (2d Cir. June 24, 2010).

If the Rule 23(a) criteria are satisfied, an action may be maintained as a class action only if it also qualifies under at least one of the categories provided in Rule 23(b).  <u>Brown</u>, 2010 WL 2520040, at *5.  In this case, plaintiffs seek to certify a class under Rule 23(b)(3), Fed R. Civ. P.  Rule 23(b)(3) permits certification "if the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.  23(b)(3); <u>Brown</u>, 2010 WL 2520040, at *6.

11

"In evaluating a motion for class certification, the
district court is required to make a 'definitive assessment of
Rule 23 requirements, notwithstanding their overlap with merits
issues,' and must resolve material factual disputes relevant to
each Rule 23 requirement." Brown, 2010 WL 2520040, at *6
(quoting In re Initial Pub. Offering Sec. Litig., 471 F.3d 24,
41 (2d Cir. 2006) ("In re IPO")).  "The Rule 23 requirements
must be established by at least a preponderance of the
evidence." Brown, 2010 WL 2520040, at *6 (citing Teamsters
Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d
196, 202 (2d Cir. 2008) ("Teamsters")).  In other words, the
district judge must "receive enough evidence, by affidavits,
documents, or testimony, to be satisfied that each Rule 23
requirement has been met." Teamsters, 546 F.3d at 204.  The
burden of proving compliance with all of the requirements of
Rule 23 rests with the party moving for certification.  In re
IPO, 471 F.3d at 40.

In this case, while serious doubts exist as to whether
plaintiffs have carried their burden with respect to the
Rule 23(a) requirements[10], there is no need to reach that

---

[10] For instance, plaintiffs completely ignore Snapple's argument
that the named plaintiffs are not typical of class members who
purchased Snapple after this action was filed in October 2007.
While the putative class includes persons who purchased Snapple
beverages as late as January 1, 2009, Weiner decided that HFCS
was not natural and stopped purchasing non-diet Snapple

question given that plaintiffs have plainly not satisfied the predominance requirement of Rule 23(b)(3). <u>E.g.</u>, <u>McLaughlin</u>, 522 F.3d at 222.

B.   Predominance

"As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." <u>Brown</u>, 2010 WL 2520040, at *6 (citation omitted). The predominance requirement is met only "if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." <u>Id.</u> at *11 (citation omitted); <u>see also</u> <u>McLaughlin</u>, 522 F.3d at 222.

In making this determination, a court considers whether the putative class members "could establish each of the . . . required elements of [their] claim[s]. . . . using common evidence." <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 280 F.3d 124, 136 (2d Cir. 2001), <u>overruled on other grounds by</u> <u>In re IPO</u>, 471 F.3d 24 (2d Cir. 2006). While a plaintiff need not show the "exclusivity" of common questions, it must show their predominance. <u>McLaughlin</u>, 522 F.3d at 231 (citation omitted).

beverages by 2005. The same was true for McCausland by 2006 or 2007. In addition, plaintiffs do not explain how Weiner and McCausland are typical of any "entities" that may be included in the putative class.

The requirement that the court conduct a "rigorous analysis" to ensure "actual, not presumed conformance" applies with "equal force to all Rule 23 requirements, including those set forth in Rule 23(b)(3)."  In re IPO, 471 F.3d at 33 n.3.

    1.   Section 349, N.Y. Gen. Bus. L.

Section 349, N.Y. Gen. Bus. L., provides:  "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  N.Y. Gen. Bus. L. § 349.  "Generally, claims under [§ 349] are available to an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or misleading advertising."  Small v. Lorillard Tobacco Co., Inc., 720 N.E.2d 892, 897 (N.Y. 1999).  "To state a claim under § 349, a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result."  Spagnola v. Chubb Corp., 574 F.3d 64, 74 (2d Cir. 2009); accord Stutman v. Chem. Bank, 731 N.E.2d 608, 611 (N.Y. 2000).

"The New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged misleading act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  Cohen v. JP Morgan Chase

& Co., 498 F.3d 111, 126 (2d Cir. 2007) (quoting Oswego
Laborers' Local 214 Pension Fund v. Marine Midland Bank, 647
N.E.2d 741, 745 (N.Y. 1995)).  "[A] private action brought under
§ 349 does not require proof of actual reliance."  Pelman ex
rel. Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir.
2005) (citing Stutman, 731 N.E.2d at 612).  "The plaintiff,
however, must show that the defendant's 'material deceptive act'
caused the injury."  Stutman, 731 N.E.2d at 612.  "In addition,
a plaintiff must prove 'actual' injury to recover under the
statute, though not necessarily pecuniary harm."  Id.

As in McLaughlin, 522 F.3d 215, proof of actual injury in
this case "is bound up in proof of damages, or by how much
plaintiffs have been harmed."  Id. at 227.  Only by showing that
plaintiffs in fact paid more for Snapple beverages as a result
of Snapple's "All Natural" labeling can plaintiffs establish the
requisite elements of causation and actual injury under § 349.
At the class certification stage, plaintiffs may demonstrate
that these elements are susceptible to generalized proof by
disclosing a suitable methodology.[11]  See, e.g., Fogarazzo v.
Lehman Bros., Inc., 263 F.R.D. 90, 106-07 (S.D.N.Y. 2009); Lapin
v. Goldman Sachs & Co., 254 F.R.D. 168, 186 (S.D.N.Y. 2008); In

---

[11] While the disclosure of the proposed methodology may suffice
when a motion to certify precedes the completion of discovery,
it would be inadequate when the motion is brought after the
close of expert discovery.

re Alstom SA Secs. Litig., 253 F.R.D. 266, 281 (S.D.N.Y. 2008).
When plaintiffs attempt such a showing, however, they must
demonstrate that the proposed methodology can be applied class-
wide and "that they could, at trial, marshal facts sufficient to
permit them to rely upon" the proposed methodology.  McLaughlin,
522 F.3d at 229.  Like any component of a Rule 23 requirement,
the court must "assess all of the relevant evidence admitted at
the class certification stage," including expert testimony, and
"determine whether . . . [this] requirement has been met."  In
re IPO, 471 F.3d at 42.

Even assuming, arguendo, that the first two elements of
plaintiffs' § 349 claim -- i.e., that Snapple's alleged
misrepresentation was "consumer-oriented" and was "likely to
mislead a reasonable consumer acting reasonably under the
circumstances" -- are susceptible to class-wide proof[12],
plaintiffs have not proposed a suitable methodology for
establishing the critical elements of causation and injury on a
class-wide basis.  Without a reliable methodology, plaintiffs
have not shown that they could prove at trial using common
evidence that putative class members in fact paid a premium for

---

[12] There is a serious question whether plaintiffs will be able to
use generalized proof to show that Snapple's use of "All
Natural" was likely to mislead a reasonable consumer.  Because
plaintiffs' motion for class certification must be denied in any
event, it will be assumed here that evidence common to the class
could be used with respect to this element of the § 349 claim.

Snapple beverages as a result of the "All Natural" labeling. And since the issue of damages is bound up with the issue of injury in this case, plaintiffs have likewise failed to show how damages could be proven class-wide.[13]  Because individualized inquiries as to causation, injury, and damages for each of the millions of putative class members would predominate over any issues of law or fact common to the class, plaintiffs' § 349 claim cannot be certified under Rule 23(b)(3).

    a.   Admissibility of Goedde's Testimony

In support of their contention that causation and injury are susceptible to generalized proof on a class-wide basis, plaintiffs rely solely on a skeletal, four-page expert report of Dr. Alan Goedde, an economist.  In his report, Goedde proposes two "approaches" for determining the purported price premium attributable to Snapple's "All Natural" labeling:  (1) a "yardstick" approach, which would use "class-wide economic data and standard economic methodologies" to "compare the price of products labeled 'All Natural' to similar products which do not have 'All Natural' labeling;" and (2) an "inherent value" approach, which would analyze unspecified "studies and market

---

[13] "[W]hile the fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification, it is nonetheless a factor that we must consider in deciding whether issues susceptible to generalized proof 'outweigh' individual issues."  McLaughlin, 522 F.3d at 231 (citation omitted).

research" to gather "data that can be used to determine the increased value, standing alone, that a product realizes due to the perception of that product being natural."  Goedde opines that both approaches could be used to develop an empirical algorithm, or formula, to prove causation and injury on a class-wide basis.

Snapple has moved, pursuant to Rule 702, Fed. R. Evid., to exclude Goedde's expert testimony.  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, the district court is the ultimate gatekeeper."  United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (citing Fed. R. Evid. 104(a)).  "The Federal Rules of Evidence assign to [the district court] 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"  Williams, 506 F.3d at 160 (quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993)).

"[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." <u>Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC</u>, 571 F.3d 206, 213-14 (2d Cir. 2009) (citation omitted).  While a district court has "broad latitude" in deciding both "<u>how</u> to determine reliability" and in reaching "its ultimate reliability determination," it may not abandon its "gatekeeping function." <u>Williams</u>, 506 F.3d at 160-61 (citation omitted).  "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse dixit</u> of the expert." <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 157 (1999) (citation omitted).

Goedde's testimony is unreliable.  Goedde does not demonstrate in adequate detail how his proposed "approaches" would be used to develop an empirical algorithm to determine, on a class-wide basis, whether there was a price premium as a result of Snapple's "All Natural" labeling and, if so, how such a premium could be quantified.  Goedde's bare-bones report provides no details concerning the significant conceptual, implementation, or data issues that would be encountered if his two approaches were adopted.  While Goedde suggests that he "can make use of class-wide economic data and standard economic methodologies," he does not discuss whether such "class-wide

economic data" is even available, or specify which "standard
economic methodologies" he will use to analyze such data.

The only detail that Goedde provides with respect to his
"yardstick" approach is that it will "analyze[] all aspects and
attributes of a product that impact the product's value . . .
[which] would include, but not be limited to, the type of tea
used in the beverage, brewing process, bottling, and ingredients
and marketing representations."  Goedde does not identify the
products to which Snapple should be compared.  Goedde also does
not explain how his approach would isolate the impact of the
"All Natural" labeling from the other factors that purportedly
affect the price of Snapple and its competitors.  He readily
admits that there may be additional factors that he has not yet
considered.  Further undermining the reliability of his opinion,
Goedde fails to acknowledge that there was no uniform price for
Snapple beverages during the class period, and thus does not
explain how his approach would account for the various prices
that putative class members actually paid in determining injury
on a class-wide basis.[14]

---

[14] In his report, Goedde does not specify whether his yardstick
approach would rely on retail or wholesale price data.  At his
deposition, Goedde asserted that his approach could determine
whether a premium exists "at any point in the distribution
chain," but provided no support for this assertion.  Given that
neither the plaintiffs nor Snapple have access to wholesale
price data of Snapple's competitors, and that fact discovery is

As for his "inherent value" approach, Goedde proposes "to assess the inherent premium value placed on such claims [that a product is "All Natural"] by consumers at large."  While Goedde intends to gather data for this approach from "studies and market research," he does not actually cite any specific studies or market research, much less demonstrate that such reports are relevant and reliable.  The documents referenced in his report refer primarily to newspaper articles and websites concerning generalized consumer perceptions about "natural" products.  Goedde concedes that he has not yet performed a review of the scientific literature[15], or designed, much less conducted, his own survey or study of consumer perceptions about "All Natural" labeling.

Goedde's testimony is also unreliable because it is based on, at most, a cursory review of the underlying record in this action.  His report shows that Goedde reviewed the complaints, but no other pleadings or testimony.  He did not read the plaintiffs' depositions, which describe how the plaintiffs

_____

closed, it is doubtful that Goedde could apply the yardstick approach at the wholesale level.

[15] In his report, Goedde states that he "reviewed literature along with documents provided in discovery which disclosed that the use of the healthy, pure natural claims has value in the marketplace."  Instead of reviewing the full text of the "literature" that purportedly informed his testimony, however, Goedde oftentimes read only summaries and abstracts of articles, brochures for certain reports, and, in one case, the table of contents of a report.

purchased Snapple beverages at various types of retailers, in different geographic locations, at various prices and times, in bulk and in single bottles, with and without discounts.  Goedde relies on two internal Snapple marketing strategy documents to support his hypothesis that Snapple's "All Natural" label allowed it to command a premium in the marketplace.  Yet he did not review the deposition transcripts of Snapple's witnesses or any of the other 240 documents produced by Snapple, which would have provided critical context for these documents.[16]

Goedde himself concedes that he has done nothing to confirm that his proposed approaches would be workable in this case. For instance, Goedde admits that if he is unable to identify comparable products for Snapple's "All Natural" beverages, then his "yardstick" approach will not work.  And yet, Goedde has not even attempted to identify any comparable products to be used in his analysis.  Nor has Goedde attempted to use his two approaches to actually build an empirical algorithm to determine whether a price premium was paid for Snapple's beverages as a result of the "All Natural" labeling.  He has stated that he will not do so until <u>after</u> a decision on class certification.

---

[16] In any event, Snapple's internal strategies alone do not prove that class members actually paid a premium as a result of the "All Natural" labeling, much less quantify the amount of any such premium paid across the class.

Given the paucity of detail in Goedde's report, particularly the absence of any indication that Goedde has considered whether, and how, his proposed methodology could account for the specific circumstances of this case, Goedde's opinion that causation and injury can be proven on a class-wide basis is speculative and, therefore, unreliable.  At a minimum, Goedde would need to determine what "standard economic methodologies" he will employ, identify the relevant "class-wide economic data" and "studies and market research," and build an actual algorithm before it could be determined whether Goedde's proposed methodology can reliably prove injury and causation on a class-wide basis.

Plaintiffs attempt to defend Goedde's testimony based not on an analysis of his work, but rather by pointing to his education, knowledge, and experience.  Goedde's qualifications as an expert are not at issue, but rather whether he has invested sufficient time and effort to develop a reliable methodology to support an expert opinion in this case.  Although plaintiffs are correct that Goedde does not need to "implement" or "test" his methodology at the class certification stage, he must still provide sufficient detail about the proposed methodology to permit a court to determine whether the methodology is suitable to the task at hand.

While plaintiffs assert that Goedde has proposed a "suitable methodology," in reality, Goedde has done nothing more than identify two possible approaches and assert that they will work in this case.  Plaintiffs essentially ask that Goedde be taken at his word.  As Goedde himself concedes, however, because he has not performed any empirical analysis or identified any relevant data, he does not yet know whether his methodology will, in fact, be workable in this case.  Plaintiffs have thus failed to demonstrate that the Court would not "have to engage in a series of speculative calculations to ascertain whether, and in what amount, plaintiffs suffered a loss."  McLaughlin, 522 F.3d at 230.

Plaintiffs contend that it is disingenuous for Snapple to argue that Goedde's testimony is unreliable given that Snapple's own expert, Dr. Keith Ugone, opined that a "benchmark" approach -- which plaintiffs contend is identical to Goedde's "yardstick" approach -- could be used to determine whether a price premium exists for Snapple beverages.  Ugone's testimony, however, is the exact opposite.  At his deposition, Ugone testified that "in this case the yardstick will not yield common proof answers for an entire class, so it's inappropriate here."  (Emphasis added.)  Ugone's expert report also concludes that Goedde's two proposed approaches "are unreliable and would be ineffective in

24

determining or quantifying actual harm in this case."[17]
Plaintiffs' reliance on Ugone's testimony is therefore
misplaced.

Ugone used average annual retail price data for the period
of 2005-2008 collected by the Nielsen Company -- which Snapple
contends is the only data available -- to perform a "benchmark"
analysis.[18]  Among other things, this data reveals,
unsurprisingly, that the price any class member paid for Snapple
during the class period varied depending on numerous factors,
including the type of retailer, the location and date of
purchase, the quantity of bottles purchased, and whether there

---

[17] Plaintiffs have moved to exclude Ugone's testimony pursuant to
Rule 702, Fed. R. Evid.  Plaintiffs argue, inter alia, that
Ugone's testimony is irrelevant and based on improper
assumptions, and that his benchmark analysis is flawed.
Plaintiffs provide no sound basis for excluding Ugone's
testimony.  At most, plaintiffs' arguments address the weight
that should be accorded Ugone's testimony, not its reliability.
Accordingly, plaintiffs' motion is denied.

[18] While not dispositive at the class certification stage,
Ugone's comparison of average retail prices of Snapple beverages
to comparable competing beverages containing HFCS, but lacking
an "All Natural" label, indicated that the average retail price
of Snapple was not systematically higher than that of its
competitors.  In addition, Ugone's analysis shows that just as
retail prices for Snapple beverages varied over time, geographic
location, type of retailer, and availability of discounts, the
differences in retail prices between Snapple and comparable
competing products also varied based on these factors.  Thus,
even if plaintiffs could identify a premium associated with a
particular Snapple purchase, the amount of this premium could
not be generalized to all purchases by putative class members.
Goedde does not explain how his methodology would account for
this complexity.

was a sale or other discount available.  Ugone also opined that
aggregate data, such as average retail prices, could not be
relied upon to determine class-wide injury accurately because
average prices are not the prices actually paid by consumers and
mask significant price variations in retail prices charged by
retailers.  Tellingly, Goedde does not address the serious
issues raised by Ugone concerning the feasibility of proving
causation and injury on a class-wide basis, much less explain
how his proposed methodology would overcome them.

　　　　In a not-so-veiled attempt to skirt the problems raised by
Ugone's report concerning Goedde's proposed methodology,
plaintiffs assert in their opposition to Snapple's motion to
exclude Goedde's testimony that Goedde's report shows "that
wholesale price premium can be demonstrated on a class-wide
basis." (Emphasis added.)  Plaintiffs' assertion that causation
and injury can be proven class-wide using wholesale, rather than
retail, price data is purely speculative and unsupported by
Goedde's testimony.  Goedde does not explain how his methodology
could be applied to wholesale prices, or how he would obtain the
data for such an analysis.  The word "wholesale" does not even
appear in Goedde's report.  In addition, Goedde has not
attempted to explain how an alleged wholesale price premium
would translate into retail premiums across the class, or how
such a retail premium could then be measured.  Because Goedde

has examined only two of over two hundred documents produced by Snapple, and has not read any deposition transcripts, he could not even have begun to analyze Snapple's wholesale pricing structure, much less that of Snapple's competitors.[19]   As such, even if it were Goedde's opinion that wholesale price data could be used to demonstrate causation and injury on a class-wide basis, he would have no basis to render such an opinion.

Because Goedde's testimony is unreliable, Snapple's motion to exclude is granted.  Without Goedde's testimony, plaintiffs offer no evidence that a suitable methodology is available to prove the elements of causation and actual injury on a class-wide basis.  Individualized inquiries would therefore be required in order to determine whether class members in fact paid a premium for Snapple beverages, and whether any such premium was attributable to the "All Natural" labeling.  This would require, among other things, an examination of each of the millions of class members' Snapple purchases, which the evidence

---

[19] Had Goedde examined Snapple's wholesale pricing structure, he would have observed that Snapple's wholesale list prices for its "All Natural" beverages, diet beverages with artificial sweeteners, and unsweetened iced tea drinks, are uniform. Because Snapple "line prices" its beverages, wholesale list prices are based on the size of the bottle and the number of bottles in a package, not on whether the beverage is labeled "All Natural."  Consistent with this practice, Snapple's price lists to its distributors, and the distributors' price lists to retailers, indicate no price differences between Snapple's "All Natural" beverages and its diet beverages of the same size and package.

shows were made in different locations, at different times, and for different prices, over the nearly eight-year class period. While Rule 23(b)(3) does not require that all issues of fact or law be common to the class, in this case, individual issues concerning causation and injury would be so substantial and burdensome that it cannot be said that common issues predominate.  As such, plaintiffs have failed to establish that the Rule 23(b)(3) predominance requirement has been met with respect to their § 349 claim.[20]

### 2.   Unjust Enrichment

"A claimant seeking relief under a theory of unjust enrichment in New York must demonstrate (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Leibowitz v. Cornell Univ., 584 F.3d 487, 509 (2d Cir. 2009) (citation omitted). Thus, plaintiffs must show "that the benefits that the members of the plaintiffs' class received were less than what they bargained for." Vigiletti v. Sears, Roebuck & Co., 838 N.Y.S.2d 785 (2d Dep't 2007); accord In re Canon Cameras Litig., 237 F.R.D. 357, 359 (S.D.N.Y. 2006).

---

[20] Snapple also argues that its defenses, including the voluntary payment doctrine, statutes of limitations, and laches, present individual questions.  Because plaintiffs have plainly failed to carry their burden to satisfy the predominance requirement as to the elements of claims, there is no need to reach this additional argument.

As with their § 349 claim, plaintiffs have not shown that they will be able to prove on a class-wide basis that class members paid a price premium for Snapple beverages as a result of the "All Natural" labeling, much less the amount of any such premium.  As such, plaintiffs have not shown that they could prove with common evidence the extent to which Snapple was unjustly enriched or the amount of restitution to which class members would be entitled.  Thus, plaintiffs have not carried their burden to show that common issues predominate with respect to the first two elements of their unjust enrichment claim.

In addition, plaintiffs do not address the issue of how they would prove, on a class-wide basis, whether the benefits that putative class members received were "less than what they bargained for."  Individualized inquiries would be required to determine, for instance, whether class members were fully informed about the inclusion of HFCS in Snapple beverages, whether they believed HFCS to be natural, and whether they continued to purchase Snapple despite their beliefs concerning HFCS.  Such individual issues would also dwarf any issues of law or fact common to the class.  Thus, plaintiffs have failed to show that the Rule 23(b)(3) predominance requirement is satisfied with respect to their unjust enrichment claim.

3.   Express Warranty

"A prima facie claim for breach of express warranty requires the plaintiff to show that there was an affirmation of fact or promise by the seller, the natural tendency of which was to induce the buyer to purchase and that the warranty was relied upon to the plaintiff's detriment." Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp., 689 F. Supp. 2d 585, 604 (S.D.N.Y. 2010) (citation omitted).  Although "[a] cause of action to recover damages for breach of an express warranty requires proof of reliance," J.C. Constr. Mgmt. Corp. v. Nassau-Suffolk Lumber & Supply, 789 N.Y.S.2d 903 (2d Dep't 2005), "[i]n contrast to the reliance required to make out a claim for fraud, the general rule is that a buyer may enforce an express warranty even if it had reason to know that the warranted facts were untrue." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007); see also CBS, Inc. v. Ziff-Davis Publ'g Co., 553 N.E.2d 997, 1000-01 (N.Y. 1990).  In order for this rule to apply, however, "[t]he plaintiff must show that it believed that it was purchasing seller's promise regarding the truth of the warranted facts." Merrill Lynch, 500 F.3d at 186.  This particular conception of reliance mandates "fine factual distinctions in [New York's] law of warranties:  a court must evaluate both the extent and the source of the buyer's

knowledge about the truth of what the seller is warranting."
Rogath v. Siebenmann, 129 F.3d 261, 264 (2d Cir. 1997).

Given New York's "basis of the bargain" conception of
reliance for express warranty claims, it is clear that
plaintiffs' purported reliance on Snapple's "All Natural" label
cannot be the subject of generalized proof.  The record in this
case, including the plaintiffs' own testimony, shows that
consumers may have purchased Snapple beverages for many reasons
other than the "All Natural" label, including their taste, glass
bottles, quirky advertising, or even the "Snapple Facts."
Individualized inquiries would therefore be required to
determine whether putative class members purchased Snapple
beverages in reliance upon the "All Natural" label, as opposed
to other considerations.  See, e.g., Klein v. Robert's Am.
Gourmet Food, Inc., 808 N.Y.S.2d 766, 773-74 (2d Dep't 2006).
In addition, the extent and source of each putative class
members' knowledge concerning the truthfulness of Snapple's "All
Natural" representation might require examination.  Thus,
plaintiffs have failed to show that the Rule 23(b)(3)
predominance requirement is satisfied with respect to their
express warranty claim.

4.   Implied Warranty

Under New York law, "[a] claim based upon a breach of an
implied warranty requires a showing of privity between the
manufacturer and the plaintiff when there is no claim for
personal injuries." Adirondack Combustion Techs., Inc. v.
Unicontrol, Inc., 793 N.Y.S.2d 576, 579 (3d Dep't 2005) (citing
Arthur Jaffee Assocs. v. Bilsco Auto Serv., Inc., 448 N.E.2d 792
(N.Y. 1983)).  Plaintiffs do not allege that putative class
members were in privity with Snapple.  Accordingly,
certification of plaintiffs' implied warranty claim would be
improper.  See McLaughlin, 522 F.3d at 228 ("[W]hen a claim
cannot succeed as a matter of law, the Court should not certify
a class on that issue." (citation omitted)).

C.   Manageability and Ascertainability

Given that plaintiffs have failed to satisfy the Rule
23(b)(3) predominance requirement, it is not necessary to
address whether plaintiffs have satisfied the remaining
requirements for class certification.  It must be noted,
however, that even if the plaintiffs overcome the predominance
hurdle, potentially serious impediments to class certification
remain.

In addition to meeting the Rule 23(a) threshold
requirements, as noted above, plaintiffs would also have to

satisfy the Rule 23(b)(3) superiority requirement.  Factors to
be considered in determining whether a class action is superior
include the "difficulties likely to be encountered in the
management of a class action."  Fed. R. Civ. P. 23(b)(3)(D); see
Seijas v. Republic of Argentina, 606 F.3d 53, 58 (2d Cir. 2010)
("[W]hether the court is likely to face difficulties managing a
class action bears on whether the proposed class satisfies the
predominance and superiority requirements.").  "[M]anageability
is an issue peculiarly within a district court's discretion."
Seijas, 606 F.3d at 58.

     The difficulty of managing a class of the size and scope
proposed by the plaintiffs is self-evident.  Based on the latest
iteration of their proposed class definition, plaintiffs would
include "[a]ll persons and entities who, within the State of New
York, purchased . . . a Snapple beverage marketed . . . as "All
Natural," but that contained [HFCS], from October 10, 2001 to
January 1, 2009."  It is undisputed that during the class
period, several millions of bottles of Snapple were sold in the
State of New York.  Because the purported class is not limited
to New York, or even United States, residents, it could
potentially include millions of consumers from around the world.
Plaintiffs have offered no explanation for how such a
geographically-dispersed class of consumers who purchased

Snapple beverages in different locations, at different times, and for different prices, could be effectively managed.

Related to, but distinct from, the issue of manageability, is the "implied requirement of ascertainability," which turns on the definition of the proposed class.  See In re IPO, 471 F.3d at 30.  "[C]lass members must be ascertainable at some point in the case, but not necessarily prior to class certification." Id. at 45 (citation omitted).  "To be ascertainable, the class must be readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling."  Charrons v. Pinnacle Group N.Y. LLC, No. 07 Civ. 6316(CM), -- F.R.D. --, 2010 WL 1752501, at *6 (S.D.N.Y. Apr. 27, 2010) (citation omitted).  "A class is ascertainable when defined by objective criteria that are administratively feasible, and when identifying its members would not require a mini-hearing on the merits of each case."  Id. (citation omitted).

Plaintiffs have failed to show how the potentially millions of putative class members could be ascertained using objective criteria that are administratively feasible.  Plaintiffs suggest that after certification, the Court could require that "[c]lass members produce a receipt, offer a product label, or even sign a declaration to confirm that the individual had purchased" a Snapple beverage within the class period.  This suggestion, to say the least, is unrealistic.  Plaintiffs offer no basis to

find that putative class members will have retained a receipt,
bottle label, or any other concrete documentation of their
purchases of Snapple beverages bearing the "All Natural"
description.  Cf. In re Holocaust Victim Assets Litig., 413 F.3d
183, 186 (2d Cir. 2005) (per curiam) (affirming district court's
approval of claims that had "the ability of being proved with
concrete documentation" and denial of claims that "would have
been very difficult to prove at trial"); Jermyn v. Best Buy
Stores, L.P., 256 F.R.D. 418, 431 (S.D.N.Y. 2009) (plaintiff
provided "documentary evidence," including a "receipt" for his
purchase, to "establish[]that he falls within the definition of
the class").  However beloved Snapple may be, there is no
evidence to suggest that its consumers treat it like a fine wine
and remove and save its labels.

Further, putative class members are unlikely to remember
accurately every Snapple purchase during the class period, much
less whether it was an "All Natural" or diet beverage, whether
it was purchased as a single bottle or part of a six-pack or
case, whether they used a coupon, or what price they paid.[21]  As
such, soliciting declarations from putative class members
regarding their history of Snapple purchases would invite them

---

[21] Notably, none of the named plaintiffs have receipts or any
other records for their Snapple purchases.  Nor can they recall
with any degree of certainty the quantity of Snapple beverages
they purchased or the prices that they paid during the class
period.

to speculate, or worse.  Moreover, the process of verifying

class members' claims would be extremely burdensome for the

court or any claims administrator.  Plaintiffs have thus failed

to prove that it would be administratively feasible to ascertain

the members of the putative class using objective criteria.[22]

---

[22] In support of their motion for class certification, plaintiffs offer the expert testimony of Lauran Schultz, the Executive Director of Hilsoft Notifications ("Hilsoft"), a firm that specializes in legal notification.  In his affidavit, Schultz estimates that in 2008 and 2009, Snapple beverages were purchased by an estimated five million adults within a six-month period in the State of New York.  Schultz opines that he "is confident [Hilsoft] will be able to develop and implement an effective notice program in [this case]."

Snapple has moved to exclude Schultz' testimony based on plaintiffs' failure to comply with Rule 26(a)(2)(B), Fed. R. Civ. P., and Schultz's lack of qualifications.  While Snapple raises serious questions about Schultz' qualifications and about plaintiffs' compliance with Rule 26, Schultz' testimony is itself irrelevant to the issue of class certification.  Schultz opines only that notification would be feasible if a class were to be certified, but offers no opinion as to whether the requirements for class certification have been met.  Further, plaintiffs do not rely on Schultz' testimony in support of class certification, except to demonstrate numerosity, which Snapple does not dispute, and to support their assertion that the class is ascertainable.  Schultz' opinion, however, does not address ascertainability, and thus plaintiffs' reliance on his testimony to satisfy this requirement is misplaced.  Accordingly, Snapple's motion to exclude Schultz' testimony is denied as moot.

CONCLUSION

For the foregoing reasons, plaintiffs' March 12, 2010
motion for class certification and April 27, 2010 motion to
exclude Ugone's expert testimony are denied.  Snapple's April 9,
2010 motion to exclude Goedde's expert testimony is granted and
its April 9, 2010 motion to exclude Schultz' expert testimony is
denied as moot.  A separate scheduling order governing further
proceedings in this action shall issue with this Opinion.

SO ORDERED:

Dated:     New York, New York
           August 3, 2010

                                    DENISE COTE
                              United States District Judge

37